FILED
United States Court of Appeals
Tenth Circuit

**July 8, 2008**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SHYLA JESSE STAR JONES a/k/a
Michelle, and ANTHONY WRIGHT,
a/k/a T, a/k/a Rose, a/k/a Playboy,

Defendants-Appellants.

Nos. 07-1123 and 07-1135

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 06-cr-00195-DME)**

---

Vicki Mandell-King, Assistant Federal Public Defender (Raymond P. Moore,
Federal Public Defender, with her on the briefs), Denver, Colorado, for
Defendant-Appellant Shyla Jesse Star Jones.

Clifford J. Barnard, Boulder, Colorado, for Defendant-Appellant Anthony Wright.

Michael C. Johnson, Assistant United States Attorney (Troy A. Eid, United States
Attorney, with him on the briefs), Denver, Colorado, for Plaintiff-Appellee.

---

Before **HENRY**, Chief Judge, **O'CONNOR**, Associate Justice, Supreme Court of
the United States (Retired), and **TACHA**, Circuit Judge.

---

**HENRY**, Chief Judge.

---

A jury convicted Shyla Jesse Star Jones and Anthony Wright of bank fraud and conspiracy after the couple orchestrated a scheme to defraud Wells Fargo Bank, where Ms. Jones worked, by cashing fraudulent checks. The jury also convicted Ms. Jones of drug trafficking and using a firearm in a drug trafficking offense after Secret Service agents arrested her for bank fraud and found marijuana and a loaded .380 caliber handgun in her vehicle.

In this direct appeal, Ms. Jones and Mr. Wright raise several claims. Ms. Jones argues, first, that the joinder of the bank fraud and conspiracy counts and the drug and firearm counts against her was not permissible under Rule 8(a) of the Federal Rules of Criminal Procedure. Second, Ms. Jones argues that the district court erred in denying her motion to sever the drug and firearm counts from the bank fraud and conspiracy counts. Mr. Wright argues that the district court erred in denying his motion to sever his trial from Ms. Jones's. Finally, Ms. Jones and Mr. Wright each argue that the district court committed three errors at sentencing: (1) incorrectly determining that they had employed "sophisticated means" in effectuating their scheme and therefore incorrectly applying a two-level enhancement to their offense levels; (2) incorrectly calculating the amount of loss; and (3) incorrectly calculating the amount of restitution by attributing certain fraudulent checks to the conspiracy.

Taking jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we

affirm.

## I. BACKGROUND

**A.    Facts**

From approximately June 2004 until December 2004, Ms. Jones worked at a Denver branch of Wells Fargo Bank as a phone bank operator.  During that time, she lived with Mr. Wright, with whom she had a long-term intimate relationship.  Ms. Jones's responsibilities at Wells Fargo included providing assistance to customers via telephone, and, as part of her job, she had access to confidential information associated with virtually every checking account in Wells Fargo's system.  Ms. Wright's access to this information enabled her to assist customers seeking to transfer funds from one Wells Fargo account to another.

Soon after she started working for Wells Fargo, Ms. Jones began to improperly access confidential customer account information, which she shared with Mr. Wright.  Around that time, Mr. Wright befriended Katherine Frank, a bank teller who worked at the same Wells Fargo branch as Ms. Jones and who also had access to confidential information associated with Wells Fargo checking accounts.  Like Ms. Jones, Ms. Frank began to pass confidential account information along to Mr. Wright.

Using a home computer and generic check stock, Ms. Jones and Mr. Wright produced false checks bearing the account information retrieved by Ms. Frank and

Ms. Jones. Either Ms. Jones or Mr. Wright would sign the checks in the account holder's name. They chose to create checks only for accounts with high balances and frequent account activity, believing that false transactions might not be detected by the holders of such accounts. As a further measure to avoid scrutiny, Ms. Jones and Mr. Wright recruited several individuals to cash the checks for them in exchange for a fee. Some of those individuals, in turn, recruited others, so that the ring of check cashers grew to more than fifteen individuals.

In February 2005, Lisa Tennyson, a Wells Fargo financial investigator, initiated a formal inquiry into reports of fraud relating to twenty-seven accounts at Ms. Jones and Ms. Frank's branch. Early in her investigation, Ms. Tennyson observed that several of the payees of the fraudulent checks had the same, or similar names. She also noticed that Ms. Jones or Ms. Frank had accessed each of the accounts in question. Subsequent investigation by Wells Fargo and federal law enforcement agents, who were contacted by Ms. Tennyson, led to cooperation from several members of the check cashing ring, including Roosevelt Freeman and Jamaal Burton, both of whom later testified against Ms. Jones and Mr. Wright at trial.

Having completed their investigation, Secret Service agents decided to arrest Ms. Jones on June 5, 2005. On that day, agents observed her driving alone in her white Chevrolet Suburban. Rather than initiating a traffic stop, the agents waited for Ms. Jones to park her vehicle. When she exited, agents detained her.

Ms. Jones left all of the vehicle's windows down, and the agents noticed a strong smell of marijuana emanating from inside. In conducting a search of the vehicle, the agents found a brown plastic bag on the floorboard of the backseat area. The bag contained marijuana, some of which was packaged in smaller bags, suggesting to the agents that it was intended for sale. They also found a small black purse containing a loaded .380 semi-automatic handgun, $1,000 cash, and Ms. Jones's driver's license.

## B.    Trial and Sentencing

The superceding indictment charged Ms. Jones and Mr. Wright with six counts relating to the check cashing scheme. Ms. Jones was also charged with two counts relating to drug trafficking and firearm possession. The two were tried jointly before a jury.

Ms. Tennyson testified that Ms. Jones and Ms. Frank compromised at least thirty accounts, and the jury heard evidence that the scheme produced approximately one hundred fraudulent checks. In addition to Wells Fargo employees and federal law enforcement officers, witnesses against Ms. Jones and Mr. Wright included Mr. Freeman, Mr. Burton, and others who had cashed checks on behalf of the couple. The government also presented testimony and other evidence concerning Ms. Jones's drug and firearm charges.

After the four day trial, a jury convicted Ms. Jones of two counts of bank fraud, in violation of 18 U.S.C. § 1344; conspiracy, in violation of 18 U.S.C. §

371; possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D); and use of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). The jury convicted Mr. Wright of four counts of bank fraud in violation of 18 U.S.C. § 1344 and conspiracy in violation of 18 U.S.C. § 371.

Secret Service Agent Nicholas Horn testified at sentencing that the fraudulent checks, including those not successfully cashed, totaled $202,452.66 in intended loss to Wells Fargo. The court found that, per U.S.S.G. § 2B1.1(b)(1)(G), a 12-level enhancement was appropriate for each defendant because the amount of intended loss was between $200,000 and $400,000. Pursuant to 18 U.S.C. § 3663A, which mandates restitution to victims of certain crimes, the court ordered joint and several restitution among Mr. Wright, Ms. Jones, and others in the amount of $115,282.40, which reflected the amount of actual pecuniary loss to Wells Fargo as a result of the scheme.

## II.  DISCUSSION

Ms. Jones and Mr. Wright raise several arguments on appeal. Ms. Jones contends that the bank fraud counts were not sufficiently related to the drug and firearm counts to be joined under Rule 8(a) of the Federal Rules of Criminal Procedure. Both Ms. Jones and Mr. Wright appeal the district court's denial of their respective motions to sever their joint trial. *See* FED. R. CRIM. P. 14.

Additionally, Ms. Jones and Mr. Wright argue that the district court erred when, pursuant to U.S.S.G. § 2B1.1(b)(9)(C), it imposed a two-level increase in the offense level after determining that the pair had employed "sophisticated means" to effectuate their scheme. They also contest both the court's calculation of the amount of loss to Wells Fargo, which resulted in a 12-level increase in the offense level under § 2B1.1(b)(1)(G), and the district court's calculation of restitution. They challenge both determinations on the grounds that the government failed to establish a sufficient nexus between their conspiracy and several checks attributed to it.

We consider each claim in turn.

## A. Misjoinder

Ms. Jones asserts that the district court erred in permitting the joinder of counts 1 through 6 of the indictment (charging conspiracy and bank fraud), with counts 7 through 8 (charging possession with intent to distribute marijuana and use of a firearm during a drug trafficking crime). Her argument arises under Rule 8(a) of the Federal Rules of Criminal Procedure, which provides that separate offenses alleged against the same individual may be joined in an indictment if the offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." FED. R. CRIM. P. 8(a). She contends that the acts giving rise to the bank fraud and conspiracy charges were not of the same character as the firearm and

drug charges, were not based on the same transaction(s), and did not otherwise constitute part of a common scheme or plan.

On appeal, Ms. Jones concedes that under Rule 12(e) of the Federal Rules of Criminal Procedure she "waived" her misjoinder claim by not "alleging a defect in the indictment or information" prior to trial. FED. R. CRIM. P. 12(b)(3)(B). *See* FED. R. CRIM. P. 12(e) ("A party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets . . . or by any extension the court provides."). Ms. Jones and the government agree that we may review the district court's decision only for plain error. *See United States v. Barrett*, 496 F.3d 1079, 1097 (10th Cir. 2007) (noting that the appellant "did not assert any misjoinder issues below" and that "the arguments he now presents regarding misjoinder are subject to review only for plain error"), *cert. denied*, 128 S. Ct. 1646 (2008); *United States v. Jordan*, 890 F.2d 247, 250 (10th Cir. 1989) ("[I]f an appellant fails to alert the trial court to claimed error, the issue cannot be raised for the first time on appeal unless plain error is held to apply.").[1] That is,

---

[1] Notwithstanding the parties' agreement, we note that the application of plain error review to a claim that has been "waived" under Rule 12(e) is in tension with the common use of the term "waiver," which usually refers to the "intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Generally, "there is no appeal from a violation of a *waived* right." *United States v. Appt*, 354 F.3d 1269, 1281 (10th Cir. 2004) (emphasis added). *Accord United States v. Olano*, 507 U.S. 725, 732-33 (1993) ("Deviation from a legal rule is error *unless the rule has been waived*") (internal quotation marks omitted) (emphasis added). On the other hand, forfeiture "is the
(continued...)

-8-

we may reverse the district court's determination only if Ms. Jones demonstrates (1) error (2) that is plain and (3) that affected her substantial rights.  *See* FED. R. CRIM. P. 52(B); *Olano*, 507 U.S. at 732.  If these three elements are met, then we may, in our discretion, correct an error that "seriously affects the fairness, integrity or public reputation of judicial proceedings."  *Olano*, 507 U.S. at 732 (internal quotation marks and citation omitted).

As a general rule, we "construe Rule 8(a) broadly to allow liberal joinder to enhance the efficiency of the judicial system."  *United States v. Johnson*, 130 F.3d 1420, 1427 (10th Cir. 1997).  We do so in part because the Supreme Court

---

[1](...continued)
failure to make the timely assertion of a right."  *Olano*, 507 U.S. at 733.  The *Olano* Court explained that "[m]ere forfeiture, *as opposed to waiver*, does not extinguish an error under Rule 52(b) [of the Federal Rules of Criminal Procedure]," meaning that a forfeited right (but not a *waived* right) may be reviewed for plain error.  *Id.* (internal quotation marks omitted) (emphasis added).

Titled "*Waiver* of a Defense, Objection, or Request," Rule 12(e) of the Federal Rules of Criminal Procedure provides that "[a] party *waives* any Rule 12(b)(3) [] objection . . . not raised by the deadline the court sets under Rule 12(c) . . . .  For good cause, the court may grant relief from the waiver."  FED. R. CRIM. P. 12(e) (emphasis added).  Ms. Jones does not dispute that she failed to object to the joinder prior to trial, and she does not now argue that she has established good cause for her untimely objection.  Thus, under Rule 12(e) she appears to have "waived" her objection to joinder of the offenses against her.  Nevertheless, we have  reviewed untimely objections to joinder for plain error, even absent a finding of good cause.  *E.g.*, *Barrett*, 496 F.3d at 1097; s*ee also United States v. Brown*, 16 F.3d 423, 427 (D.C. Cir. 1994) ("[W]e review the Rule 8 issue under the plain error standard because . . . [the appellant] failed to preserve this issue for appeal.").  Therefore, we will review Ms. Jones's claim for plain error.

"has long recognized that joint trials 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'" *United States v. Lane*, 474 U.S. 438, 449 (1986) (quoting *Bruton v. United States*, 391 U.S. 123, 134 (1968)).

Even if we were to assume that Ms. Jones could show error that was "clear or . . . obvious," *Olano*, 507 U.S. at 734 (internal quotation marks omitted), she could not prevail in this instance because she has not demonstrated that the joinder affected her substantial rights. The Supreme Court has explained that "an error involving misjoinder" under Rule 8 "affects substantial rights and requires reversal only if the misjoinder results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *Lane*, 474 U.S. at 449 (internal quotation marks and citation omitted). In particular, "overwhelming evidence of guilt" and a "proper limiting instruction" are relevant to whether a misjoinder prejudiced defendants. *See id.* at 450; *see also United States v. Robinson*, 978 F.2d 1554, 1560 (10th Cir. 1992) (noting that "'the overwhelming evidence of guilt' and the trial court's 'proper limiting instruction' were 'important considerations'" in *Lane*) (quoting 474 U.S. at 450).

Here, there was overwhelming evidence of guilt as to the drug trafficking and firearm charges. When the Secret Service arrested Ms. Jones, she was the only occupant of the vehicle, which was registered in her name. At least one agent testified that the odor of marijuana coming from the vehicle was so strong

that agents were able to smell it while standing several feet away. The jury also learned of the small bags of marijuana behind the vehicle's passenger, and they were told of Ms. Jones's black purse, which agents found near the drugs and which contained a loaded .380 semi-automatic handgun, $1,000 in cash, and Ms. Jones's driver's license. An agent testified that when Ms. Jones was asked about the gun and the drugs, she said "something to the effect that 'I know I'm in a lot trouble for that stuff.'" Rec. vol. VII, at 557.

There was also overwhelming evidence of Ms. Jones's guilt with respect to the bank fraud and conspiracy charges of which Ms. Jones was convicted. Jurors heard testimony from several co-conspirators, who described Ms. Jones and Mr. Wright's criminal organization in elaborate detail and explicitly discussed Ms. Jones's role as a central figure in the scheme. Ms. Tennyson testified that Ms. Jones used her status as a phone banker to improperly access certain Wells Fargo account information and that the scheme produced fraudulent checks from the very accounts that Ms. Jones improperly accessed.

Moreover, the district court issued the following limiting instruction, which provided in relevant part:

> A separate crime is charged against one or more of the defendants in each count of the indictment. You must separately consider the evidence against each defendant on each count and return a separate verdict for each defendant.
> Your verdict as to any one defendant or count, whether it is guilty or not guilty, should not influence your verdict as to any other defendant or counts.

Rec. vol. I, doc. 172, at 5 (instr. no. 4). One of our sister circuits has observed with respect to this instruction that "[e]rror based on misjoinder is almost always harmless where, as here, the trial court issues a careful limiting instruction to the jury on the issue of possible prejudice resulting from the joinder." *United States v. Cody*, 498 F.3d 582, 587 (6th Cir. 2007). Moreover, "we presume that juries follow [limiting] instructions." *United States v. Lane*, 883 F.2d 1484, 1498 (10th Cir. 1989).

We have explained that "[p]lain error is fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." *United States v. Henning*, 906 F.2d 1392, 1397 (10th Cir. 1990) (internal quotation marks and citation omitted). Ms. Jones has failed to make such a showing in this case. Because Ms. Jones has not shown that there was (1) error (2) that was plain and (3) that affected her substantial rights, our inquiry ends here. We need not consider whether the district court's decision "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736 (internal quotation marks and citation omitted).

**B.    Severance**

Prior to trial, Ms. Jones and Mr. Wright filed separate motions for severance under Rule 14 of the Federal Rules of Criminal Procedure, which provides that a district court may sever the trial of otherwise properly joined

defendants or joined offenses if a joint trial "appears to prejudice a defendant or

the government." FED. R. CRIM. P. 14(a). Ms. Jones moved for severance of the

drug and firearm counts from the bank fraud and conspiracy counts on the

grounds that she wished to testify on the drug and firearm counts but not on the

bank fraud and conspiracy counts. Mr. Wright sought to sever his trial from Ms.

Jones's, arguing that evidence of her drug trafficking would prejudice his defense.

The district court denied both motions, and Ms. Jones and Mr. Wright now

appeal.

As a general rule, "[t]he decision to grant severance and order separate

trials is within the sound discretion of the trial court." *United States v. Pursley*,

474 F.3d 757, 767 n.7 (10th Cir. 2007). Thus, "[w]e will not disturb the trial

court's decision absent an affirmative showing of abuse of discretion and a strong

showing of prejudice." *United States v. Stiger*, 413 F.3d 1185, 1197 (10th Cir.

2005) (internal quotation marks omitted).[2]

---

[2] The government argues that Ms. Jones waived her severance argument because she did not renew it at trial. While the government concedes that no Tenth Circuit case has explicitly adopted this rule, it notes that in *Barrett*, 496 F.3d at 1097, we approvingly cited the opinion of a sister circuit that employed this view of Rule 14 motions. The defendant-appellant in *Barrett* had failed to raise *any* claim of misjoinder below. By way of supporting its conclusion that Mr. Barrett's appellate claim would be subject to review only for plain error, a panel of this court cited *United States v. Carter*, 481 F.3d 601, 606-07 (8th Cir. 2007). *Carter* applied the plain error standard where defendant moved for a severance prior to trial but did not renew his motion during trial. In our view, the *Barrett* panel's citation to *Carter* did not amount to a rule requiring defendants to

(continued...)

### 1. *Ms. Jones*

In the case of a defendant who, like Ms. Jones, moves for severance because she wishes to testify as to one or some counts but not as to others, "no need for severance exists until the defendant makes a convincing showing that [s]he has both important testimony to give concerning one count *and* a strong need to refrain from testifying on the other." *United States v. Martin*, 18 F.3d 1515, 1518-19 (10th Cir. 1994) (internal quotation marks and citations omitted) (emphasis added). In order to demonstrate "convincing need," the defendant must "present enough information . . . to satisfy the court that the claim of prejudice is genuine and to enable it to intelligently weigh the considerations of economy and expedition in judicial administration against the defendant's interest in having a free choice with respect to testifying." *Id.* at 1519.

Ms. Jones's memorandum supporting her motion for severance explained that she needed to testify on the drug and firearm counts in order to prove that she was not in knowing possession of drugs when Secret Service Agents arrested her. First, she claimed she would testify that she did not state "I know I'm in a lot trouble for that stuff" in reference to the drugs in the back seat of her car. Rec. vol. I, doc. 134, at 3. Second, Ms. Jones said she would explain that she carried a

---

[2](...continued)
renew their Rule 14 motions at trial. Indeed, such a rule was not necessary in *Barrett*, and we have not embraced *Carter*'s proposition in other opinions.

gun to protect herself and did not use it in connection with drug deals. *Id*. at 3-4. In support of her "strong need" not to testify on the bank fraud counts, Ms. Jones contended simply that "she did not have any involvement with this conspiracy." *Id*. at 3. She tersely continued: "It is [Ms. Jones's] contention that she has been wrongly identified by the government witnesses who allege that she was somehow involved in this scheme. Ms. Jones intends to exercise her right to have the government prove its case against her beyond a reasonable doubt." *Id*.

Even assuming, for the sake of argument, that Ms. Jones made a convincing showing that she had important testimony to give with regard to the firearm and drug counts, her stated desire to force the government to meet its burden of proof with respect to the bank fraud and conspiracy counts did not establish Ms. Jones's purportedly strong need to refrain from testifying with respect to those counts. If a defendant's desire not to testify on a particular count, without more, amounted to a compelling need not to testify, then required severance would be the rule, and not the exception. Notably absent in her memorandum, submitted with the motion, was a discussion of evidence that the government might introduce if she chose to testify on the bank fraud counts. Moreover, we see no reason why counsel for Ms. Jones could not have endeavored to clarify the meaning of Ms. Jones's alleged comment through cross-examination.

In short, Ms. Jones failed to demonstrate that she would be strongly prejudiced if the counts remained joined. We therefore conclude that the district

court did not abuse its discretion in denying Ms. Jones's motion to sever counts one through six from counts seven and eight. Because the district court did not abuse its discretion, we need not consider whether Ms. Jones was in fact prejudiced by the court's ruling. *See Stiger*, 413 F.3d at 1197.

## 2. *Mr. Wright*

Mr. Wright concedes that joinder of the counts against Ms. Jones and him was proper under Rule 8(b) of the Federal Rules of Criminal Procedure, which provides that an "indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction." FED. R. CRIM. P. 8(b). Rule 8(b) further provides that "defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count." *Id.* Nevertheless, Mr. Wright contends that the district court erred in denying his motion for severance for two reasons. First, he avers that evidence presented at trial regarding Ms. Jones's drug trafficking and firearm offense prejudiced his defense as a result of a spillover effect. Specifically, he argues that evidence of Ms. Jones's drug trafficking, as well as evidence of his drug trafficking, which defense counsel elicited, prejudiced his defense by confusing the jury and creating an unfavorable impression of him with jurors. Second, he contends that Ms. Jones and he presented mutually exclusive defenses. Mr. Wright raised only the first argument before the district court.

We will consider whether the district court abused its discretion in denying

-16-

Mr. Wright's motion to sever on the grounds that drug and firearm evidence presented against Ms. Jones, and against Mr. Wright as part of Ms. Jones's defense, would prejudice his defense by way of a spillover effect. *See Stiger*, 413 F.3d at 1197.

Because Mr. Wright did not raise his second severance argument before trial, pursuant to Rule 12(e) of the Federal Rules of Criminal Procedure, we may review that contention only for plain error. *See Barrett*, 496 F.3d at 1097 (reviewing for plain error when a defendant failed to raise a severance motion before trial); *United States v. Dewitt*, 946 F.2d 1497, 1502 (10th Cir. 1991) (observing that then-Rule 12(f), which Rule 12(e) has replaced, "applies not only to the failure to make a pretrial motion, but also to the failure to include a particular argument in the motion"). Thus, with respect to his second contention, Mr. Wright must demonstrate (1) error (2) that is plain and (3) that affected his substantial rights. *See* FED. R. CRIM. P. 52(b); *Olano*, 507 U.S. at 732. As noted above, we may correct the error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (alterations and internal quotation marks omitted).

Generally, "[w]hen defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a *specific trial right* of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."

-17-

*Zafiro v. United States*, 506 U.S. 534, 539 (1993) (emphasis added). Because Mr. Wright and Ms. Jones were charged with conspiracy, Mr. Wright "must overcome the presumption that in a conspiracy trial it is preferred that persons charged together be tried together." *Stiger*, 413 F.3d at 1197 (internal quotation marks omitted). Further, we are mindful that "Rules 8(b) and 14 are designed 'to promote economy and efficiency and to avoid multiplicity of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial.'" *Zafiro*, 506 U.S. at 540 (quoting *Bruton*, 391 U.S. at 132 n.6).

### a. *Spillover*

Mr. Wright's memorandum in support of his motion for severance did not explicitly cite a specific trial right that would be compromised by a joint trial. Instead, he articulated a fear that he would be found "guilty by association" because the jury could not "realistically be expected to compartmentalize and segregate that which applies only to Defendant Anthony Wright as distinguished from that which implicates only co-defendant Jones." Rec. vol. I, doc. 126, at 6, 7. Yet, his filings before the court failed to discuss any specific evidence that might prejudice his defense, and he offered no explanation of his theory that jurors could not be expected to separate evidence of Ms. Jones's drug trafficking from evidence of bank fraud and conspiracy against him.

On appeal, Mr. Wright argues that he was prejudiced by a spillover effect

at trial, although his spillover theory before this court differs somewhat from the one articulated in his motion for severance. In particular, he observes that counsel for Ms. Jones elicited testimony from a government witness regarding *his* alleged drug dealing and made comments about the same in her opening and closing statements, evidently for the purpose of suggesting that Mr. Wright – and not Ms. Jones – was responsible for the marijuana Secret Service agents found in Ms. Jones's vehicle. During her opening statement, counsel for Ms. Jones forecasted, "You will hear testimony from different witnesses that Mr. Wright is the person who sells marijuana." Rec. vol. VI., at 175. The district court then allowed Ms. Jones to elicit from Mr. Freeman that he had purchased marijuana from Mr. Wright in 2005 and watched Mr. Wright sell marijuana to others on more than twenty occasions. Mr. Wright further observes that counsel for Ms. Jones asked Mr. Burton, "[Y]ou have known Mr. Wright to sell drugs before?" Aplt. Wright's Br. at 20 (quoting Rec. vol. VII, at 171). However, the district court did not permit Mr. Burton to answer that question. Finally, Mr. Wright notes that counsel for Ms. Jones referred to his alleged drug dealing in her closing statement.

Though the district court allowed Ms. Jones to establish the possibility that she was unaware of the presence of drugs in her vehicle by permitting her to suggest that Mr. Wright had placed them there, it wisely chose to hedge against possible prejudice to Mr. Wright by giving several limiting instructions.

Following Mr. Freeman's testimony the court addressed the jury:

> Ladies and gentlemen, one limiting instruction. When Mr. Freeman was testifying about his drug transactions with Mr. Wright, you will remember that Mr. Wright is not charged with dealing drugs and, therefore, that testimony is not relevant to the charges against Mr. Wright in this case and should not be considered by you when you are considering Mr. Wright's liability or not for the charges against him.

Rec. vol. VI, at 246-247. Further, the court's final jury instructions directed the members to "separately consider the evidence against each defendant on each count and return a separate verdict for each count and return a separate verdict for each defendant." Rec. vol. I, doc. 172, at 5 (instr. no. 4). The court also reminded jurors that "[t]he defendants are not on trial for any act, conduct, or crime not charged in the superceding indictment." *Id.* at 15 (instr. no. 14).

The Supreme Court has observed that, in the context of joint trials, "limiting instructions [] often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539. As noted above, notwithstanding Mr. Wright's contentions, "as a general rule, we presume that juries follow [limiting] instructions." *Lane*, 883 F.2d at 1498. *See also United States v. Cardell*, 885 F.2d 656, 668 (10th Cir. 1989) ("[T]hat juries can and will follow the instructions they are given is fundamental to our system of justice."). In this case, we see no reason to conclude that the jury did not follow the court's limiting instructions. Further, Mr. Freeman's testimony and the comments of Ms. Jones's attorney would not have helped the government establish the elements of bank fraud and conspiracy

-20-

beyond a reasonable doubt. Mr. Wright has called our attention to no other evidence of prejudice with respect to his spillover claim, and our review of the record has uncovered none.

As a general rule, neither "a mere allegation that defendant would have a better chance of acquittal in a separate trial" nor an argument that evidence against one defendant would have a "spillover effect" on another defendant demonstrates prejudice. *Small*, 423 F.3d at 1182 (internal quotation marks omitted). *See also Zafiro*, 506 U.S. at 540 ("[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."). Having found no basis to conclude either that the district court abused its discretion or that Mr. Wright was prejudiced by the joinder, we affirm the district court's decision to deny his motion for severance.

### b. *Mutually Exclusive Defenses*

A trial court must apply a three-step inquiry when considering an argument that a defendant will be prejudiced because he and a co-defendant will present defenses that are mutually exclusive. *Pursley*, 474 F.3d at 765. First, the court must determine whether the two defenses are "so antagonistic that they are mutually exclusive." *Id.* (internal quotation marks omitted). Second, because "mutually antagonistic defenses are not prejudicial *per se*," the court must consider whether there is "a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about

guilt or innocence." *Id*. (quoting *Zafiro*, 506 U.S. at 539). Third, if a defendant

shows that his case satisfies the first two factors, the trial court must "weigh the

prejudice to a particular defendant caused by joinder against the obviously

important considerations of economy and expedition in judicial administration."

*Pursley*, 474 F.3d at 765 (alteration and internal quotation marks omitted). We

have observed that "[t]o warrant a finding that a district court abused its

discretion by not severing a trial, the conflict between the defendants' defenses

must be such that the jury, in order to believe the core of one defense, must

*necessarily* disbelieve the core of the other." *United States v. Dazey*, 403 F.3d

1147, 1165 (10th Cir. 2005) (emphasis added) (internal quotation marks omitted).

According to Mr. Wright, the core of his defense was that the government's

witnesses were lying and that he did not in fact commit bank fraud or enter into a

conspiracy to do so. He observes that Ms. Jones's counsel made some statements

that were antagonistic to this defense, contending that Mr. Wright orchestrated the

bank fraud and even exercised some measure of control over Ms. Jones. For

example, Ms. Jones's counsel asserted in her opening statement that Mr. Wright

was the "head" of the bank fraud operation. Rec. vol. VI, at 174. In her closing

argument, counsel for Ms. Jones again accused Mr. Wright of "running that

organization." Rec. vol. IX, at 37.

To be sure, these statements were antagonistic to Mr. Wright's defense, but

the core of Ms. Jones's defense was not so antagonistic to Mr. Wright's that the

two defenses were mutually exclusive. Mr. Wright's guilt was not, in itself, a viable legal defense for Ms. Jones, and it was not an indispensable component of her theory of the case. Indeed, the "core" of Ms. Jones's defense – that she did not act knowingly or voluntarily with respect to any of the alleged acts – did not necessarily depend on Mr. Wright's guilt. *See id.* (Ms. Jones's counsel stating, "[I]t will be up to you to decide when you go back to deliberate, did Shyla Jones act knowingly and voluntarily[?]"). In our view, the jury could have simultaneously believed that the government's witnesses were lying about Mr. Wright's involvement in the bank fraud conspiracy and that Ms. Jones did not knowingly commit bank fraud. *Cf. Zafiro*, 506 U.S. at 542 (Stevens, J., concurring) ("There is no logical inconsistency between a version of events in which one person is ignorant, and a version in which the other is ignorant; unlikely as it may seem, it is at least theoretically possible that both versions are true, in that both persons are ignorant."). Thus, a severance was not necessary.

## C. Sentencing

### 1. *Sophisticated Means*

Ms. Jones and Mr. Wright each contend that the district court erred in assessing a two-level increase in their offense levels per U.S.S.G. § 2B1.1(b)(9)(C) for the use of "sophisticated means" to commit bank fraud. The government recommended that the district court apply § 2B1.1's "sophisticated means" enhancement, and the presentence reports endorsed this view.

Notwithstanding Mr. Wright's and Ms. Jones's objections, the district court adopted the government's recommendation. Here, Ms. Jones and Mr. Wright argue that the district court incorrectly applied the provision because, in their view, the use of generic check stock and a home computer to create fraudulent checks entails a less elaborate scheme than the provision demands.

"When reviewing a district court's application of the Sentencing Guidelines, we review legal questions *de novo* and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Martinez*, 418 F.3d 1130, 1133 (10th Cir. 2005) (internal quotation marks omitted). Here, Ms. Jones and Mr. Wright have not contested findings of fact or the district court's interpretation of the Guidelines; they contest only the district court's application of the Guidelines to the facts. Therefore, we will review the district court's decision deferentially rather than *de novo*. *See United States v. Rice*, 52 F.3d 843, 849 (10th Cir. 1995) (affording "due deference" to a district court's application of a "sophisticated means" enhancement under § 2T1.3(b)(2)). The Supreme Court has explained that deferential appellate review of a district court's application of the Guidelines to undisputed facts is appropriate because, as a general rule, "the district court is in a better position than the appellate court to decide whether a particular set of individual circumstances" merits application of a Guidelines provision. *Buford v. United States*, 532 U.S. 59, 64 (2001).

-24-

Section 2B1.1(b)(9) provides that a sentencing court must assess a two-level increase in the offense level of a defendant

> [i]f (A) the defendant relocated, or participated in relocating a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of the fraudulent scheme was committed from outside the United States; or (C) *the offense otherwise involved sophisticated means . . . .*

U.S.S.G. § 2B1.1(b)(9) (emphasis added). The accompanying commentary explains that "sophisticated means" refers to an "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id*. cmt. n.8(B). *See United States v. Torres-Ruiz*, 387 F.3d 1179, 1181 (10th Cir. 2004) ("Commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.") (internal quotation marks omitted). Comment 8(B) offers two examples of "sophisticated means": (1) "a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction"; and (2) "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." *Id.*

Here, the district court supported its ruling by noting that Ms. Jones's and Mr. Wright's scheme was sophisticated insofar as they used elaborate methods to

-25-

avoid detection.

> I think the use of inside people to gain account information that is confidential and not available to the public at large shows a degree of sophistication. The use of computers and computer programming is certainly more sophisticated than simply stealing a check out of an envelope or mail box and signing the wrong name to it. I think that the recruiting of a very large operation with supervision and (inaudible) and advice as to how to enhance the ability to cash checks in a fraudulent way all goes beyond the degree of sophistication that would be ordinary for a check — a bank fraud situation.
>
> So, by a preponderance of the evidence, I conclude that there is an adequate basis to support the adjustment for sophistication in this case.

Rec. vol. X, at 70.

Like the district court, we are persuaded that Ms. Jones and Mr. Wright employed especially complex methods, which enabled them to conceal from a sophisticated company (with a full-time investigative staff, no less) a scheme that produced approximately one hundred fraudulent checks. In addition to Ms. Jones, Mr. Wright recruited Ms. Frank to purloin confidential account information from the bank. Mr. Wright and Ms. Jones then created fraudulent checks only for the accounts that they had determined had frequent activity and high balances under the assumption that the holders of those accounts would be less likely to detect inconsistencies in their bank statements. We agree with the district court that the couple's creation of checks with a home computer, while not requiring considerable technical acumen, added to the scheme's sophistication in that the tactic was designed to avoid detection of fraud.

Moreover, Ms. Jones and Mr. Wright prolonged their scheme by recruiting a sizeable group of check cashers. At sentencing, Secret Service Agent Horn testified that he and other agents had interviewed sixteen individuals who cashed fraudulent checks as part of the conspiracy. Notably, check cashers often used false identities and disguised their appearances so that they could cash multiple fraudulent checks at the same branch. Also, Mr. Wright instructed some of them to paint the pads of their fingers with clear nail polish so that, in the event that the bank asked for a fingerprint on a check, they would not leave an accurate print.

In *United States v. Wright*, the Fifth Circuit approved the application of § 2B1.1's "sophisticated means" enhancement provision for a scheme that was less complex than the one at issue. 496 F.3d 371, 377-79 (5th Cir. 2007). In that case, the defendant, a mortgage broker, misrepresented the net worth of some of his clients to potential lenders. He did so by purchasing cashier's checks in the names of his clients and forwarding copies of the checks to the lenders, thereby giving the impression that the checks were the borrowers' assets. *Id.* at 378-79. The *Wright* court's holding relied not on the inherent sophistication of purchasing cashier's checks – an uncomplicated enterprise in itself – but on the government's observation that the defendant's method made detection of his fraud "more difficult." *Id*. at 379. *See also United States v. Bistrup*, 449 F.3d 873, 882-83 (8th Cir. 2006) (upholding the application of § 2B1.1's "sophisticated means"

enhancement provision and noting that "[w]hile some of [the defendant's] acts individually may not have been particularly sophisticated, there were complexities in his overall scheme").

Relying primarily on *United States v. Rice*, 52 F.3d 843 (10th Cir. 1995), Ms. Jones and Mr. Wright urge that their scheme's purported absence of cutting-edge technology and financial wizardry deprives it of § 2B1.1's requisite level of sophistication. *See* 52 F.3d at 849. In *Rice*, we held that an individual's tax evasion scheme did not merit a "sophisticated means" enhancement under § 2T1.3(b)(2). However, the provision at issue in *Rice* pertained only to tax offenses and specified that enhancement was appropriate only if the offense "demonstrate[d] greater intricacy or planning than a routine tax evasion case." *Id.* (quoting § 2T1.3(b)(2) commentary).[3] In contrast, the commentary accompanying § 2B1.1 does not require that Ms. Jones and Mr. Wright's scheme have been more sophisticated than the average bank fraud scheme. In fact, the section applies to offenses other than bank fraud, including larceny, offenses involving stolen property, property damage, or property destruction, fraud, forgery, and counterfeiting. U.S.S.G. § 2B1.1 (heading). More importantly, the explicit concern underlying the *Rice* court's decision was that if the relatively simple

---

[3] In the time since we decided *Rice*, § 2T1.3(b)(2) has been replaced with U.S.S.G. § 2T1.1. The application notes for the new provision employ a definition of "sophisticated means" identical to that in § 2B.1.1. *See* § 2T1.1 cmt. 4.

scheme at issue there was "sophisticated," "then every fraudulent tax return [would] fall within that enhancement's rubric." *Rice*, 521 F.3d at 849. That concern is not applicable here: Ms. Jones's and Mr. Wright's scheme is readily distinguishable from less sophisticated means by which the myriad crimes within the ambit of § 2B1.1 may be committed.

We therefore conclude that the district court did not err in deciding that Ms. Jones and Mr. Wright employed "sophisticated means" to effectuate their fraudulent scheme.

## D.     Amount of Loss & Amount of Restitution

Section 2Bl.1 provides a schedule of offense level enhancements for certain crimes, including bank fraud, that inflict pecuniary loss on victims. Under § 2B1.1, "loss" is the greater of "actual loss" or "intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). Whereas "actual loss" refers to "the reasonable foreseeable pecuniary harm that resulted from the offense," "intended loss" "(I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* cmt. n.3(A)(i)-(ii).

Relying on the presentence reports and evidence offered by the government at sentencing, the district court found the amount of intended loss resulting from Ms. Jones and Mr. Wright's scheme to be $201,656.41. Accordingly, per § 2B1.1(b)(1)(G), the court enhanced each defendant's offense level by twelve

because the amount of loss was between $200,000 and $400,000. Pursuant to 18 U.S.C. § 3663A, the court ordered joint and several restitution among Ms. Jones, Mr. Wright, and several co-defendants in the amount of $115,282.40.

On appeal, Ms. Jones and Mr. Wright's sole argument is that the district court erred in including government trial exhibits 15-17, 19, 20, 60, 61, 63, 64, 74, and 79 (referred to as such at sentencing), in its calculations of loss and restitution. They maintain that these checks did not have a sufficient nexus to their bank fraud conspiracy to be added to the amount of loss at sentencing. In their view, by considering these checks, the district court overcalculated the amount of loss (and restitution) by $17,614.34 and wrongly applied a 12-level enhancement instead of a 10-level one. *See* § 2B1.1(b)(1)(F) (establishing 10-level enhancement where amount of loss is between $120,000 and $200,000).

Because both arguments challenge factual findings underlying the district court's calculations, we review the court's decisions for clear error. *See United States v. Flanders*, 491 F.3d 1197, 1217 (10th Cir. 2007) ("[W]e review the . . . factual findings [underlying restitution orders] for clear error . . . ."); *Martinez*, 418 F.3d at 1133. In undertaking our review, we recognize that the government has the burden of proving the amount of loss by a preponderance of the evidence. *United States v. Ary*, 518 F.3d 775, 787, 790 (10th Cir. 2008). However, "[t]he district court's factual findings constitute clear error when our review of the entire record leaves us with the definite and firm conclusion that a mistake has

-30-

been made." *Id*. at 787 (citation and internal quotation marks omitted).

In this case, the record does not leave us with the definite and firm conclusion that a mistake has been made. Agent Horn testified at sentencing that the correct amount of loss was over $200,000. He stated that he and other agents interviewed sixteen individuals who were part of the check cashing ring, and he described Ms. Jones and Mr. Wright's criminal organization, illustrating its structure with a detailed chart. He testified that he communicated frequently with Ms. Tennyson and others at Wells Fargo to identify passers of bad checks and accounts that had been compromised. Once Agent Horn identified a fraudulent check from an account known to have been improperly accessed by Ms. Jones or Ms. Frank, he sought to confirm a link between the check and the charged conspiracy. *Id.* at 18-19.

None of the parties questioned Agent Horn with explicit reference to Exhibits 15-17, 19, 20, 60, 61, 63, 64, 74, or 79. In fact, during Agent Horn's direct examination, counsel for the government noted that she intended to direct most of his testimony to checks not discussed at trial because "the defense is not really disputing Government's Trial Exhibits 1 through 44, 48 through 79." Thus, while the checks at issue were listed in the government's chart detailing its proposed calculation for amount of loss, they were not the subject of a particularized discussion at sentencing. Nevertheless, Agent Horn noted that each of the checks determined to be from Ms. Jones and Mr. Wright's scheme,

implicitly including those at issue, were manufactured using the same computer program and the same generic check stock. Agent Horn further observed that the check numbers were typically part of a consecutive series on the same compromised account and that each was passed within the same time frame in the Denver metropolitan area.

The trial record provides further support for the conclusion that the district court did not commit clear error. All of the challenged exhibits were admitted into evidence during the testimony of Ms. Tennyson. Like Agent Horn, Ms. Tennyson testified that each of the checks was produced using the same generic check stock and the same computer program. She further testified that Exhibits 15-17, 19, 20, 60, 61, and 74 were: (1) counterfeit and (2) drawn from accounts that either Ms. Jones or Ms. Frank had improperly accessed.

Ms. Jones and Mr. Wright observe that there was no specific testimony at trial or at sentencing regarding the identity of the individual who accessed the checking accounts from which Exhibits 63, 64, and 79 were drawn. Additionally, they note that no evidence specifically links "Jamaal K. Watkins," the payee of those checks, to the conspiracy.

Nevertheless, we do not believe the district court committed clear error with respect to Exhibits 63, 64, and 79. To begin, given that members of the conspiracy often used false identities to cash checks, the failure of the government to connect the checks to an actual person named Jamaal K. Watkins is

considerably less damaging to the district court's finding than Mr. Wright and Ms. Jones have suggested. It was undisputed that payee Jamaal K. Watkins, who shared a first name with co-conspirator Jamaal Burton, attempted to cash these checks in the Denver metropolitan area on September 22, 2004, while Ms. Jones and Ms. Frank were still working at Wells Fargo and while Ms. Jones's and Mr. Wright's conspiracy was producing fraudulent checks. In fact, not including Exhibits 63, 64, and 79, members of the conspiracy cashed, or attempted to cash, eleven fraudulent checks in September 2004 in the Denver metropolitan area, and they attempted to cash two of those on September 22. More importantly, both Agent Horn's and Ms. Tennyson's testimony supported the conclusion that Exhibits 63, 64, and 79 were counterfeited checks, each designed to fraudulently withdraw money from one of two Wells Fargo accounts. The checks were made from the same generic stock that produced other checks in the conspiracy, and they were virtually identical in appearance to the other fraudulent checks.

In light of this evidence, we do not have a definite and firm belief that the district court made a mistake – that it clearly erred in determining that the checks were attributable to the conspiracy. *See Ary*, 518 F.3d at 787. Therefore, we find that the district court did not err in its calculation of the amount of loss or restitution.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Ms. Jones's and Mr. Wright's

-33-

convictions and sentences.  We also DISMISS Mr. Wright's motion for release pending the disposition of his appeal as well as any other pending motions related to this appeal.