FILED
United States Court of Appeals
Tenth Circuit

October 27, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

v.

DEBBIE L. GRIFFITH,

  Defendant-Appellant.

No. 07-5156

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:06-CR-165-HDC)**

---

Barry L. Derryberry, Assistant Federal Public Defender (Julia L. O'Connell, Acting Federal Public Defender, with him on the briefs), Tulsa, Oklahoma, for Defendant-Appellant Debbie L. Griffith.

Leena Alam, Assistant United States Attorney (David E. O'Meilia, United States Attorney, with her on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee United States of America.

---

Before **BRISCOE, BRORBY,** and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

  Debbie L. Griffith ("Griffith") pled guilty to embezzling more than $1,000

from the U.S. Department of Veterans Affairs ("VA"), in violation of 18 U.S.C.

§ 641. Griffith misappropriated and converted to her own use VA benefit payments belonging to David Norvell ("Norvell"), for whom she acted as fiduciary and benefits payee. The district court sentenced Griffith to eighteen months' imprisonment and ordered her to pay Norvell restitution of $27,002.

In this appeal, Griffith challenges both the district court's calculation of loss–and its consequent determination of her base offense level–under the Sentencing Guidelines, U.S.S.G. § 2B1.1, and its calculation of restitution under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A(c)(1)(A)(ii). Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we AFFIRM the district court's loss calculation, VACATE the restitution order, and REMAND to the district court for re-calculation of restitution.

I.     FACTUAL AND PROCEDURAL BACKGROUND

Norvell, a veteran of the Korean War, began receiving VA disability benefit payments in 1960, when he was rated 10% disabled for frostbite to his feet. Griffith met Norvell at the V.F.W. in late 2000, shortly before the death of Norvell's wife of forty-five years. The two became friends, and after Norvell's wife died, Griffith began helping him to manage his daily affairs. By September of 2001, Griffith was assisting Norvell with his personal finances. Griffith, who had been married during the early days of her friendship with Norvell, was divorced in July of 2002, and eventually the two began dating.

By October of 2002, according to VA records, Norvell was suffering from post-traumatic stress disorder ("PTSD") in addition to frostbite, and his disability rating was increased to 30% as a result of the combination of those conditions. The VA deemed Norvell "incompetent to handle [his] own financial affairs" on January 13, 2003 (R. vol. III. at 69), at which time his "overall or combined [disability] rating [was] 60%" (R. vol. I, tab 11, at Exh. 3, at 2.).[1]  Two months later, on March 12, 2003, Griffith signed a VA form entitled "Responsibilities of a Federal Payee of VA Funds" (the "payee agreement") and was appointed as Norvell's fiduciary and payee.  (R. I, tab 11, at Exh. 2.)

As a federal payee for a VA beneficiary, Griffith was "responsible for receiving all [Norvell's] income and seeing that [Norvell's] just debts [were] paid."  (Id. at 1.)  The payee agreement instructed Griffith that she "must establish a custodial checking account and submit verification in writing from [her] bank when this is done."  (Id.)[2]  It further instructed her as follows:

---

[1]The pertinent VA document included in the record on appeal is undated, but was sent to Griffith after she was "certified as legal custodian and payee on behalf of [David] Norvell for . . . VA purposes."  (R. vol. I, tab 11, at Exh. 3, at 1.)  Griffith did not become Norvell's payee until March 12, 2003.  However, VA investigator and agent Bryan Sewell testified that the incompetency determination was made on January 13, 2003, and Norvell's stepson, James Stevens, likewise testified that the VA's determinations of both Norvell's incompetency and his 60% disability rating were made on that date.

[2]The fiduciary was directed to follow the fiduciary agreement's instructions for setting up such a custodial checking account.  Those instructions were inexplicably crossed out on the form that Griffith signed.

3.　　All disbursements are to be made by check from the custodial checking account. No checks for cash, no cash withdrawals, no exceptions. You must keep accurate records at all times.

4.　　**You must obtain prior approval from [the VA] office for expenditures over $200.** (However, this does not include medical needs or normal monthly payments such as rent, utilities, food.)

5.　　Funds are to be used for the beneficiary only. **You cannot borrow, loan, or give as gifts, funds belonging to the beneficiary.**

(Id.) Griffith also signed, at this time, a VA fiduciary form in which she "agree[d] to furnish if requested" periodic accountings of Norvell's VA benefit funds.[3] The VA made its first payment to Griffith as payee, a lump sum of $1,419, on March 24, 2003. Effective July 28, 2003, Norvell's disability rating was raised to 100%, based on his PTSD. As a result of this adjustment, Norvell's benefit payments increased from roughly $800 monthly to roughly $2200 monthly.

In March of 2004, a VA field examiner visited Griffith and Norvell and reported that Norvell appeared to be well cared-for. The field examiner also reported that the "fiduciary[-]beneficiary relationship" was "good" and that "[t]he veteran and payee plan[ned] to be married on April 3rd." (R. vol. III at 79.) Griffith and Norvell married on April 3, 2004, and Griffith became Norvell's VA

---

[3]This document is not included in the record on appeal. However, Agent Sewell had the document before him at Griffith's sentencing hearing and testified as to its contents.

"spouse-payee" soon thereafter. As a result of the marriage, Norvell's disability payments were increased to $2,366 monthly. In notifying Griffith of this change, the VA informed her that "[t]he veteran's monthly benefits include[d] an additional allowance for [her], as a dependent of the veteran." (R. vol. I, tab 11, Exh. 5, at 1.) At the time of the marriage, Griffith was thirty-nine years old, and Norvell was seventy-three.

Within a month of the marriage, Norvell's family began to suspect that Griffith had been defrauding him before the marriage and was continuing to defraud him. Norvell's bank accounts, which typically had held moderate end-of-month balances in 2001 and low end-of-month balances in 2003, had been depleted to near zero or negative balances by the spring of 2004. Indeed, Norvell had declared bankruptcy on April 2, 2004, the day before his marriage to Griffith. After the family confronted Norvell with their suspicions, he moved out of the couple's home in June of 2004, aided by his son Tim and the Broken Arrow, Oklahoma, police. Norvell then notified the VA that he was divorcing Griffith because she had run off with his money. Norvell's stepson, James Stevens, replaced Griffith as Norvell's fiduciary and VA benefits payee on July 19, 2004. The couple divorced in November of 2004.

The VA's investigation of Griffith's handling of Norvell's benefits covered the period from March 24, 2003, when she received the first payment in her role as payee, to April 1, 2004, when she received the last payment before she was

designated as spouse-payee. Agent Sewell determined that during that period, $22,870.27 in electronic deposits had been made to Norvell's checking account. Griffith did not establish a custodial checking account, as required by the VA fiduciary form, but instead added her name to one of Norvell's existing accounts. Agent Sewell further determined that while she was acting as Norvell's payee, Griffith made unauthorized cash withdrawals of $17,520 from Norvell's benefits-holding account, and that she wrote on that account several checks "that were clearly outside of [her] fiduciary duty." (R. vol. III at 50.) On January 18, 2006, Griffith gave Agent Sewell a written statement admitting that while she was acting as Norvell's fiduciary and was "responsible for approximately $20k in VA funds," she "misus[ed]" those funds. (R. vol. I, tab 11, Exh. 6 at 1).

Griffith was indicted on a single count of theft of U.S. property in violation of 18 U.S.C. § 641, under a grand jury charge that she "did intentionally, willfully and knowingly embezzle, steal, purloin, and convert to her own use money in excess of $1,000.00." (R. vol. I, tab 2.) The indictment charged that this money was in the form of VA benefit checks "of a value of approximately $22,870.00." (Id.) Griffith pled guilty to this single count but did not make a plea agreement.

Under the 2006 edition of the Sentencing Guidelines, U.S.S.G. § 2B1.1(a)(2), Griffith's base offense level was six. The offense level was increased by two because the victim was vulnerable, id. § 3A1.1(b)(1), and additionally by two because Griffith abused a position of private trust, id.

- 6 -

§ 3B1.3.  The final Presentence Investigation Report ("PSR")[4] calculated loss at

$83,739, which resulted in a further increase of eight offense levels.  Id.

§ 2B1.1(b)(1)(E).  The offense level was decreased by three because Griffith

accepted responsibility for her conduct.  U.S.S.G. § 3E1.1.  Coupled with

Griffith's Criminal History Category of I, her resulting offense level of fifteen

produced an advisory sentencing range of eighteen to twenty-four months'

imprisonment.  The PSR further calculated Griffith's mandatory restitution at

$27,002, payable to Norvell.

Griffith objected to the PSR's calculation of both loss and restitution.

Regarding the loss calculation, she argued both that the Government had not

proven contested facts regarding offense conduct, and that the PSR impermissibly

included non-criminal conduct as relevant conduct under U.S.S.G. § 1B1.3.

Regarding restitution, she argued that the PSR's calculation impermissibly

included losses caused by conduct outside the offense of conviction.

The district court overruled each of Griffith's objections.  First, the district

court explained that the acts described as relevant conduct in the PSR "clearly

constitute law violations involving crimes [such] as larceny, embezzlement, [and]

unauthorized use of access devices," and that those acts–including Griffith's

---

[4]The original PSR, issued on January 26, 2007, was revised on March 21, 2007, and again on June 21, 2007.  The probation office also issued a final, undated, addendum to the PSR in response to Griffith's objections to the June 21, 2007, document.

"sham" marriage to Norvell–were "part of the same course of conduct and a common scheme or plan as the offense of conviction." (R. vol. IV at 6, 8.) The district court went on to find that the Government had proved by a preponderance both the direct loss and estimated loss portions of the PSR's loss calculation. Finally, the district court found that "[o]nly losses derived directly from Veterans Administration funds" were used to calculate restitution, which thus was based solely on "the specific conduct [underlying] the offense of conviction." (Id. at 13.)

The district court sentenced Griffith to eighteen months' imprisonment and imposed restitution of $27,002. Griffith timely appealed.

## II. Discussion

### A. *Griffith's challenge to the district court's loss calculation*

#### 1. Standard of review

"A district court's loss calculation at sentencing is a factual question we review for clear error." United States v. Ary, 518 F.3d 775, 787 (10th Cir. 2008). Reversing for clear error "'requires that, based on the entire evidence, we have a definite and firm conviction that a mistake has been committed.'" United States v. Hahn, 551 F.3d 977, 979 (10th Cir. 2008) (quoting O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1221 (10th Cir. 2007) (further quotation omitted)). We review de novo any legal questions underlying the district court's

application of the Guidelines.  United States v. Leach, 417 F.3d 1099, 1105 (10th Cir. 2005).

The Government bears the burden of proving loss by a preponderance of the evidence.  United States v. Sutton, 520 F.3d 1259, 1262 (10th Cir. 2008) (citing United States v. Schild, 269 F.3d 1198, 1200 (10th Cir. 2001)).

### 2.      Guidelines provisions

Under the Sentencing Guidelines, "loss" means "the greater of actual loss or intended loss," with "actual loss" defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."[5]  U.S.S.G. § 2B1.1, cmt. n.3(A). For cases involving government benefits, "loss" is further defined as "not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses . . . .  For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50."  Id. cmt. n.3(F)(ii) (emphasis added).  Where evidence of direct loss is not available, the district court "need only make a reasonable estimate of the loss."  Id. cmt. n.3(C); see Sutton, 520 F.3d at 1262-63. Further, the comments to the Guidelines instruct that we are to give "appropriate deference" to the district court's determination, because the "sentencing judge is

---

[5]"Intended loss," which is not at issue in this appeal, means "the pecuniary harm that was intended to result from the offense," including "harm that would have been impossible or unlikely to occur."  U.S.S.G. § 2B1.1, cmt. n.3(A)(ii).

in a unique position to assess the evidence and estimate the loss based upon that evidence." U.S.S.G. § 2B1.1, cmt. n.3(C).

i.    Relevant conduct under the Guidelines

In calculating loss under the Guidelines, the district court does not limit itself to conduct underlying the offense of conviction, but rather may consider all of the defendant's "relevant conduct." U.S.S.G. § 1B1.3; see id. § 1B1.2(b) (directing the district court, "[a]fter determining the appropriate offense guideline section," to "determine the applicable guideline range in accordance with § 1B1.3 (Relevant Conduct)"). In pertinent part, the Guidelines define "relevant conduct" as follows:

(1)(A)  all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense; [and]

(2)    solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts,[6] all

_____

[6]Section 3D1.2 dictates that

[a]ll counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a)    When counts involve the same victim and the same act or transaction.

(b)    When counts involve the same victim and two or more acts or

(continued...)

- 10 -

> acts and omissions described . . . above that were part of the same course of conduct or common scheme or plan as the offense of conviction.

Id. § 1B1.3(a) (footnote added). The Guidelines commentary further explains that

> For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi. . . .
>
> . . . . Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.

Id. § 1B1.3, cmt. n. 9. "'We have interpreted this language to mean that if the conduct is sufficiently similar and within the same temporal proximity, it may be considered relevant for purposes of determining the guideline range.'" United States v. Williams, 292 F.3d 681, 685 (10th Cir. 2002) (quoting United States v. McClelland, 141 F.3d 967, 973 (10th Cir. 1998)).

---

[6](...continued)
> transactions connected by a common criminal objective or constituting part of a common scheme or plan.

    (c)    When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

    (d)    When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

Relevant conduct under the Guidelines thus "'comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct.'" United States v. Altamirano-Quintero, 511 F.3d 1087, 1095 (10th Cir. 2007) (quoting United States v. Allen, 488 F.3d 1244, 1254-55 (10th Cir. 2007)). Nonetheless, relevant conduct "still must relate to the offense of conviction." Id. (quotation omitted). While we review for clear error the district court's factual findings in support of a determination of relevant conduct, we "review the ultimate determination of relevant conduct de novo." United States v. Tran, 285 F.3d 934, 938 (10th Cir. 2002).

ii.     Relevant conduct as criminal conduct

Six other circuits have held that relevant conduct under the Guidelines must be "criminal" or "unlawful." See, e.g., United States v. Chube, 538 F.3d 693, 702 (7th Cir. 2008) (explaining that relevant conduct must be unlawful); United States v. Maken, 510 F.3d 654, 657-59 (6th Cir. 2007) (reciting 6th Circuit precedent to the effect that relevant conduct must "amount[] to an offense for which a criminal defendant could potentially be incarcerated"); United States v. Culverhouse, 507 F.3d 888, 895 (5th Cir. 2007) ("An offense need not have resulted in a conviction to constitute relevant conduct under the guidelines, but the conduct must be criminal."); United States v. Dove, 247 F.3d 152, 155 (4th Cir. 2001) (concluding that "relevant conduct under the Guidelines must be criminal conduct"); United States v. Dickler, 64 F.3d 818, 830-31 (3d Cir. 1995) (same); United States v.

Sheahan, 31 F.3d 595, 600 (8th Cir. 1994) (same). Like this court, see Altamirano-Quintero, 511 F.3d at 1095, the First, Second, and Ninth Circuits have held that uncharged and even acquitted conduct may constitute "relevant conduct" under the Guidelines, but have not explicitly held that such conduct must be "criminal" or "unlawful," see, e.g., United States v. Juwa, 508 F.3d 694, 700 (2d Cir. 2007); United States v. Reyes-Echevarría, 345 F.3d 1, 7 (1st Cir. 2003); United States v. Peyton, 353 F.3d 1080, 1089 (9th Cir. 2003).

Our description of relevant conduct as including "uncharged and even acquitted conduct," Altamirano-Quintero, 511 F.3d at 1095 (quotation omitted), strongly suggests that the conduct at issue must at least be criminally chargeable. That suggestion comports with the reasoning of courts that have held that relevant conduct must be criminal or unlawful. See, e.g., United States v. Peterson, 101 F.3d 375, 385 (5th Cir. 1996) ("To hold otherwise would allow individuals to be punished by having their guideline range increased for activity which is not prohibited by law but merely morally distasteful or viewed as simply wrong by the sentencing court."); Dove, 247 F.3d at 155 (explaining that if relevant conduct need not be criminal, sentencing courts would become mired "in the impossibly subjective task of determining the relative 'benignness' of various legally permissible acts").

Among those courts that have held that relevant conduct must be criminal, those that have taken up the question have also held that the criminal violation

may be of either a federal or a state statute.  See, e.g., Maken, 510 F.3d at 657-58;

Dickler, 64 F.3d at 831; United States v. Bell, 46 F.3d 442, 445 (5th Cir. 1995);

see also United States v. Newbert, 952 F.2d 281, 285 (9th Cir. 1991) (holding that

under U.S.S.G. § 1B1.3, "conduct which could be the basis of state prosecution

may be considered for sentencing purposes on a federal conviction for other

conduct which was part of the same common scheme or plan").

Agreeing with the reasoning of our sister circuits, and making explicit what

has been implicit in our own precedent, we hold that for a district court to

consider a defendant's conduct as "relevant" under the Sentencing Guidelines, the

Government must prove by a preponderance of the evidence that the defendant (1)

engaged in conduct (2) related to the offense of conviction pursuant to U.S.S.G.

§ 1B1.3 and (3) constituting a criminal offense under either a federal or a state

statute.[7]

### 3.    The district court's calculation of loss

--------

[7]By holding that the defendant's relevant conduct must constitute a state or
federal criminal offense, rather than that it must be criminally chargeable under a
state or federal law, we rely on our precedent holding that conduct may be
relevant under the Guidelines even when that conduct could not be separately
prosecuted because the statute of limitations has run.  United States v. Neighbors,
23 F.3d 306, 311 (10th Cir. 1994).  Nine other circuits have reached the same
conclusion regarding statutes of limitations and relevant conduct.  See United
States v. Williams, 217 F.3d 751, 753-54 and 753 n.7 (9th Cir. 2000) (joining this
court and seven other circuits to hold that "a district court may consider as
relevant conduct for sentencing purposes actions which may be barred from
prosecution by the applicable statute of limitations," and citing cases); United
States v. Ziskind, 491 F.3d 10, 16-17 (1st Cir. 2007).

The district court calculated loss based on Griffith's conduct underlying the offense of conviction as well as her relevant conduct in "schem[ing] . . . to defraud Mr. Norvell of his assets and income" before she became his VA fiduciary. (R. vol. IV at 7.) At sentencing, the court explained that "all acts committed by the defendant were part of the same course of conduct and a common scheme or plan as the offense of conviction," and that those acts "clearly constitute law violations involving crimes [such] as larceny, embezzlement, [and] unauthorized use of access devices." (Id. at 6.) Further, "the acts determined to be relevant conduct are acts of fraud or deceit, criminal conduct for which [U.S.S.G. §] 3D1.2(d) would require grouping." (Id.)

The court then determined that Griffith's fraudulent course of conduct caused loss of **$83,739**, as follows:

1.  **$5,118.01 in direct loss conceded by Griffith, consisting of**

    **$695** used to pay for Griffith's bankruptcy filing;

    **$100** used to pay off one of Griffith's personal loans;

    **$160** in checks to Griffith's mother, Betty Spencer;

    **$88.01** used to pay for women's clothing;

    **$2,000** used as a down payment on a house in Griffith's name; and

    **$2,075** in checks made payable to Griffith and deposited in her personal account.

2.  **$32,495 in direct loss not conceded by Griffith, consisting of**

**$9,495** lost to Norvell when Griffith made numerous unauthorized cash withdrawals in the amount of $15,985, occasionally noting on checks that the cash would be used to pay bills. Griffith then failed to pay bills totaling $9,495;

**$7,000** lost to Norvell when Griffith induced him to sell a home he owned, resulting in issuance of a $15,000 proceeds check to Norvell and his son Ross; Griffith intercepted the check, forged Ross Norvell's name, and deposited the money into one of Norvell's accounts before causing a $9,000 cashier's check to be made payable to her from that account;[8] and

**$16,000** lost to Norvell when he traded in his 1939 Hudson, valued at $6,000, as a down payment on his purchase of a 2002 Pontiac, valued at $16,000, for Griffith's exclusive use, and financed the remainder of the $16,000 purchase price with a $10,000 installment loan. Griffith later failed to make payments on that loan, leading to the vehicle's repossession.

3.   **Estimated loss of $46,126, consisting of 60% of $76,876 in the following "questionable expenditures," from which Griffith benefitted more than did Norvell:**

**$15,960** (60% of $26,600) lost to Norvell when Griffith induced him to obtain a $26,600 mortgage loan and then "dissipat[ed] this . . . asset" (Addendum to PSR at 9-10);

**$12,036** (60% of $20,060) lost to Norvell when Griffith dissipated the $6,000 balance of the $15,000 proceeds of the sale of the home referenced above, the $7,000 balance that had been in one of Norvell's accounts in 2001, and $7,060 in lump-sum VA payments; and

**$18,130** (60% of $30,216) lost to Norvell when Griffith misused his credit to accumulate debts of $30,216.

---

[8]Two thousand dollars of this money went to the down payment accounted for as direct loss conceded by Griffith; therefore, that two thousand dollars is not counted here.

Based on this loss calculation, and pursuant to Guideline § 2B1.1(b)(1)(E), the district court increased Griffith's offense level by eight, because the loss was more than $70,000 but less than $120,000. The district court also stated, on the record, that even if it had found the loss to be less than $70,000, it would have imposed the same sentence of eighteen months' imprisonment.[9]

### 4. Analysis

Griffith argues that the district court erred in two ways: by basing its loss calculation on facts alleged in the PSR but not proven by a preponderance; and by impermissibly including non-criminal conduct as relevant conduct under the Guidelines. We consider each argument in turn.

### i. Facts proven by a preponderance

Prior to sentencing, Griffith objected to all but $5,118.01 of the district court's loss calculation. See supra § II.A.3(1).

_____

[9]With a total offense level of fifteen and a Criminal History Category of I, Griffith's advisory sentencing range was eighteen to twenty-four months. If the district court had found loss to be more than $30,000 but less than $70,000, it would have increased Griffith's base offense level by six rather than by eight, U.S.S.G. § 2B1.1(b)(1)(D), resulting in a total offense level of thirteen. Combined with Griffith's Criminal History Category of I, an offense level of thirteen would have produced an advisory sentencing range of twelve to eighteen months' imprisonment. Judge Cook thus made clear that while he was sentencing Griffith at the low end of her advisory range based on a loss higher than $70,000, he would have sentenced her at the high end of her advisory range based on a loss lower than $70,000.

a. Direct loss

The record contains evidence demonstrating by a preponderance that beginning in mid-2003, while she was Norvell's fiduciary, Griffith began making unauthorized cash withdrawals (including checks made out to cash) from one of Norvell's bank accounts, sometimes making notations on the checks to the effect that the money was for payment of bills. These withdrawals are substantiated by copies of checks made payable to Cash or to Griffith, as well as by copies of cash withdrawal slips. During the period that Griffith was making these withdrawals, she failed to make payment on a number of Norvell's bills, in the amount of $9,495. The Government has provided copies of these bills, as well as clear evidence that they were not paid.[10] The Government thus proved the $9,495 direct loss by a preponderance.

The Government likewise proved by a preponderance the direct loss of $7,000 from the sale of one of Norvell's properties in December 2002, shortly before the VA declared Norvell "incompetent to handle [his] own financial affairs" (R. vol. III. at 67) on January 13, 2003. The Government put on evidence that Griffith forged the signature of Norvell's son Ross on the check for the

---

[10]Norvell's stepson testified that when he returned to Oklahoma to become fiduciary for his stepfather in July of 2004, Norvell gave him a shoebox containing unpaid, past-due bills. The shoebox also contained checks that had been made out to pay the bills and even inserted in envelopes for mailing, but that had never been mailed.

proceeds of this sale, deposited the check into one of Norvell's accounts, and then had a cashier's check issued to herself from that account.

Far less compelling is the Government's evidence that Griffith should be held responsible for $16,000 in direct loss resulting from Norvell's purchase of a 2002 Pontiac for her exclusive use. After Norvell traded in his 1939 Hudson, valued at $6,000, for the down payment on the Pontiac, he financed the remainder of the $16,000 purchase price with a $10,000 installment loan. When Griffith failed to make payments on the installment loan, the vehicle was repossessed. Yet despite acknowledging the repossession of the Pontiac, which served as collateral on the installment loan, the PSR held Griffith accountable for the unpaid balance on that loan, and the district court adopted this element of the PSR's loss calculation. The Government failed to prove by a preponderance that Griffith's conduct caused a loss of $10,000 in unpaid loan debt where the collateral on that debt was seized. Therefore, the district court clearly erred in including this $10,000 debt in its direct loss calculation.[11]

### b. Estimated loss

To arrive at its calculation of $46,126 in estimated loss, the district court accepted the PSR's finding that Griffith was responsible for 60% of $78,876 in questionable expenditures made over the course of her relationship with Norvell.

_____

[11]Because Norvell did lose the 1939 Hudson in his transaction to purchase the Pontiac, the district court did not err in including the Hudson's $6,000 value in its loss calculation.

- 19 -

The court explained that "the probation officer estimated loss by considering the victim's financial situation, his habits both prior to and after the involvement of the defendant" in his life. (R. vol. IV at 10.)  The probation officer then determined "total funds available during the term of the defendant's involvement with Norvell," with those "total funds" consisting of "income, loans, proceeds from the sale of assets, and credit expenditures." (Id. at 10-11.)  "Based on Norvell's lifestyle, expenditures and credit history prior to Griffith's involvement in his affairs and his [financial] recovery since," the PSR deemed it "reasonable to conclude that Griffith profited more from [the questionable] expenditures than [did] Norvell." (PSR at 9.)  The PSR thus estimated that Griffith benefitted from 60% of those expenditures, while Norvell benefitted from 40%.  The district court accepted this estimate, attributing to Griffith as loss 60% of the expenditures at issue.

"The [district] court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, cmt. n.3(C); see Ary, 518 F.3d at 788.  Having carefully reviewed the record, we are satisfied that the district court's method of estimating loss in this case was reasonable.  We are likewise satisfied that the Government proved by a preponderance that Griffith should be held accountable for the dissipation of 60% of $46,660 in Norvell's funds.  These funds included a $26,600 mortgage loan, $6,000 in proceeds remaining from the sale of one of his properties after Griffith diverted $9,000 of those proceeds, the $7,000 balance

Norvell had held in one of his bank accounts in 2001, and $7,060 in lump-sum benefit payments from the VA.

We conclude that the Government failed to prove by a preponderance, however, that Griffith caused Norvell "loss," as that term is defined in § 2B1.1, when she "misused [his] credit totaling $30,216." (Addendum to PSR at 11.) In short, the Government offered no evidence that this credit card debt was ever paid, and the commentary to the Guidelines makes clear that loss must constitute "pecuniary harm." U.S.S.G. § 2B1.1, cmt. n.3(A)(i)-(iii). While we do not doubt that Griffith's conduct caused harm to Norvell's credit rating, "pecuniary harm" under the Guidelines "does not include . . . harm to reputation, or other non-economic harm." Id., cmt. n.3(A)(iii). Instead, such harm must be "monetary or . . . otherwise . . . readily measurable in money." Id. Here, the Government did not put on evidence demonstrating that Griffith caused Norvell "pecuniary harm," and thus loss, when she misused his credit. Nor did it allege or put on evidence that her conduct caused loss to victims other than Norvell, such as the credit card companies. Consequently, the district court clearly erred when it included in its loss calculation $18,130 attributable to Griffith's misuse of Norvell's credit.

### c. Conclusion as to this issue

The district court clearly erred in including $28,130 in its calculation of loss. Subtracting that amount from the court's overall loss calculation of $83,739 leaves us with total loss of $55,609. Pursuant to Guideline § 2B1.1(b)(1)(D), the

district court thus should have increased Griffith's offense level by six, rather than by eight, leaving her with an advisory sentencing range of twelve to eighteen months rather than eighteen to twenty-four months.

However, because the district court stated on the record that it would have sentenced Griffith to the same term of imprisonment–eighteen months–even if it had found loss to be under $70,000, the court's error here was harmless.  See Williams v. United States, 503 U.S. 193, 202-03 (1992) (explaining that remand is not necessary "to rectify an 'incorrect application' of the Guidelines" where "the error was harmless, i.e., [where] the error did not affect the district court's selection of the sentence imposed"); United States v. Graham, 466 F.3d 1234, 1239-40 (10th Cir. 2006).  Here, had the district court properly calculated loss at $55,609, Griffith's sentence of eighteen months' imprisonment would have remained within her advisory Guideline range and thus would have been presumptively reasonable on appeal, see United States v. Mumma, 509 F.3d 1239, 1243 (10th Cir. 2007).

Because the district court's error in calculating loss was harmless, we need not remand for correction of that error.

           ii.      Inclusion of non-criminal conduct as relevant conduct

In calculating loss derived from Griffith's relevant conduct, the district court took into account what it found to be Griffith's ongoing scheme to defraud

Norvell of his money and assets, both before and after she became his VA fiduciary and payee, and both before and after she became his wife.

In challenging this element of the loss calculation, Griffith emphasizes that in a case involving theft of government benefits, the Guidelines commentary defines "loss" as "not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses."  U.S.S.G. § 2B1.1, cmt. n.3(F)(ii). Griffith misreads this commentary, eliding the phrase "not less than" and asserting that "[t]o establish the appropriate loss amount, the government had to establish the dollar amount of VA benefits that were diverted from Norvell's support, maintenance and benefit."  (Aplt. br. at 15.)  Far from establishing a ceiling on loss under § 2B1.1, however, the commentary Griffith cites instead establishes a floor for that calculation.  Therefore, the district court did not err in factoring into its loss calculation harm caused by Griffith's relevant conduct aside from that underlying the offense of conviction, which was theft of Norvell's VA benefits.  See U.S.S.G. § 1B1.3; Altamirano-Quintero, 511 F.3d at 1095.

Griffith further argues that even if the district court correctly considered conduct outside the offense of conviction, it erred in considering conduct that was not criminal.  The gist of this argument is twofold: first, that in the brief period in which Griffith was Norvell's spouse-payee, she was legally entitled to use his VA benefits for her own purposes; and second, that "[e]ven assuming that prior to

becoming his payee Griffith allowed or encouraged Norvell to be generous toward her with his money, that conduct would not be criminal." (Aplt. br. at 18.)

As to the first claim, the district court found that Griffith's marriage to Norvell was a sham, "intended primarily, if not solely, to further [Griffith's] fraudulent plans." (R. vol. IV at 7.) In other words, the marriage itself was "part of the same course of conduct and a common scheme or plan as the offense of conviction." (Id. at 6.) Having reviewed the record evidence, we cannot say this finding was clearly erroneous.

As to Griffith's second claim, the district court found that the conduct underlying her ongoing "scheme . . . to defraud Mr. Norvell of his assets and income," carried out both "while [she was] acting informally as a helper for his financial affairs" and while she was "a formal Veterans Administration fiduciary," constituted criminal behavior. (Id. at 7.) The court explained that Griffith's repeated acts of fraud against Norvell "involv[ed] crimes [such] as larceny, embezzlement, [and] unauthorized use of access devices." (Id. at 6.) The district court did not identify the specific state and federal statutes under which Griffith could have been charged for those crimes. However, the PSR, which the court adopted in its entirety and without change, explained that Griffith's relevant conduct "involve[d] acts of Larceny by fraud and stealth, in violation of 21 Okla. St[at]. Ann. § 1701[;] Embezzlement, in violation of 21

Okl[a]. St[at]. Ann. § 1451[;] and Fraud and Related Activity in Connection with Access Device, contrary to 18 U.S.C. § 1029." (Addendum to PSR at 4.)

Based on our holding today that in order to consider non-offense conduct as relevant conduct under the Guidelines, the Government must prove by a preponderance of the evidence that the defendant (1) engaged in conduct (2) related to the offense of conviction pursuant to U.S.S.G. § 1B1.3 and (3) constituting a criminal offense under either a federal or a state statute, we conclude that the district court did not err in characterizing as relevant conduct Griffith's attempts to defraud Norvell both before she became his VA fiduciary and payee and after she became his wife.

For the foregoing reasons, we AFFIRM the district court's loss calculation.

B.      *Griffith's challenge to the restitution order*

1.    Governing law and standard of review

The MVRA mandates, in pertinent part, that the district court must impose restitution when sentencing a defendant convicted of an offense "in which an identifiable victim . . . has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). Just as "the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order" under the Victim Witness and Protection Act of 1982 ("VWPA"), Hughey v. United States,

- 25 -

495 U.S. 411, 420 (1990), so are restitution orders under the MVRA[12] limited to "losses caused by the offense of conviction," United States v. Gordon, 480 F.3d 1205, 1211 (10th Cir. 2007). Furthermore, restitution under the MVRA "must be "based on actual loss," which "[t]he government bears the burden of proving." United States v. Quarrell, 310 F.3d 664, 678, 680 (10th Cir. 2002).

"[T]he purpose of restitution is not to punish defendants or to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." United States v. Serawop, 505 F.3d 1112, 1124 (10th Cir. 2007) (quotation omitted). "Consequently, a district court that orders restitution in an amount greater than the total loss caused by the offense thereby exceeds its statutory jurisdiction and imposes an illegal sentence." Id. (quotation, alterations omitted).

We review de novo the legality of a restitution order. Gordon, 480 F.3d at 1210. We review the district court's underlying factual findings for clear error, "and the amount of restitution for abuse of discretion." Serawop, 505 F.3d at 1117.

### 2. Identity of VA benefits

Griffith's offense of conviction was theft of U.S. property in violation of 18 U.S.C. § 641. In her Petition to Enter Plea of Guilty and Order Entering Plea,

---

[12]The MVRA "was passed in 1996 as a supplement to the Victim and Witness Protection Act, 18 U.S.C. § 3663." United States v. Barton, 366 F.3d 1160, 1165 (10th Cir. 2004).

Griffith admitted that "[f]rom March, 2003, to July, 2005, [she] embezzled more than one thousand dollars . . . from the Department of Veterans Affairs . . . by taking DAV benefits of David Norvell and converting them to [her] own use." R. vol. 1, tab 4, at 2.) She explained to the district court that the VA benefit checks were deposited directly into Norvell's checking account, and that he then would sign checks for her so that she "would get the benefit of" the VA money. (R. vol. VI at 11.) She further acknowledged that the "cumulative total of all these checks" deposited into Norvell's account was $22,870. (Id.)

Before we may consider episodes of putative actual loss of VA funds caused by Griffith's offense conduct, we must determine whether those funds, once deposited into a beneficiary's account and made available for withdrawal, would retain their identity as VA funds. While the federal courts have not addressed this question with reference to § 641, the Supreme Court and lower courts have done so with reference to 38 U.S.C. § 5301 and its predecessor statutes, which exempt veterans' benefits "from taxation, . . . from the claim of creditors, and . . . [from] attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary." 38 U.S.C. § 5301(a)(1).

The World War Veterans' Act of 1924, 38 U.S.C. § 454, provided that "'[t]he compensation, insurance, and maintenance and support allowance payable [to veterans] shall not be assignable; shall not be subject to the claims of creditors

- 27 -

of any person to whom an award is made . . . ; and shall be exempt from all taxation.'" Trotter v. Tennessee, 290 U.S. 354, 356 (1933) (quoting 38 U.S.C. § 454). In Trotter, the Supreme Court held open the question of whether veterans' benefits received under this statute retained their exempt character once they were in the hands of the veteran or "on deposit in a bank." Id. The Trotter Court did conclude, however, that such benefits lost their exempt character once they had "lost the quality of moneys and were converted into land and buildings." Id. at 356-57.

Congress then amended the statute, mandating both that veterans' benefits were to remain exempt "'either before or after receipt by the beneficiary'" and that the benefits' exempt status "should not extend 'to any property purchased in part or wholly out of such payments.'" Lawrence v. Shaw, 300 U.S. 245, 249 (1937) (quoting 38 U.S.C. § 454, as amended by the World War Veterans' Act of 1935). In Lawrence, the Court held that veterans' benefits deposited in a bank retained their exempt character so long as those "deposits are made in the ordinary manner such that the proceeds of the collection are subject to draft upon demand for the veteran's use." Id. at 250. "[A] mere allowance of interest upon deposits," the Court noted, would not "be enough to destroy an immunity [to taxation and attachment] where it would otherwise attach." Id. However, the Court later explained in Carrier v. Bryant, 306 U.S. 545, 547 (1939), that

- 28 -

"[i]nvestments purchased with money received in settlement of benefits" do not retain their exempt character.

The statute assumed its current form in 1958, when it was amended to provide that

> [p]ayments of benefits due or to become due under any law administered by the Veterans' Administration shall not be assignable except to the extent specifically authorized by law, and such payments made to, or on account of, a beneficiary shall be exempt from taxation, shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary. The preceding sentence shall not apply to claims of the United States arising under such laws nor shall the exemption therein contained as to taxation extend to any property purchased in part or wholly out of such payments.

38 U.S.C. § 3101(a) (1958) (quoted in Porter v. Aetna Cas. & Surety Co., 370 U.S. 159, 159 n.1 (1962)). In Porter, the Court extended Lawrence's holding to veterans' benefit funds on deposit in federal savings and loan associations.

> Since legislation of this type should be liberally construed to protect funds granted by the Congress for the maintenance and support of the beneficiaries thereof, we feel that deposits such as are involved here should remain inviolate. The Congress, we believe, intended that veterans in the safekeeping of their benefits should be able to utilize those normal modes adopted by the community for that purpose–provided the benefit funds, regardless of the technicalities of title and other formalities, are readily available as needed for support and maintenance, actually retain the qualities of moneys, and have not been converted into permanent investments.

370 U.S. at 162 (citations omitted). Congress gave the statute its current numbering, 38 U.S.C. § 5301, in 1991.

We think that <u>Porter</u>'s interpretation of § 5301 is equally applicable to VA funds at issue under § 641. Therefore, as long as a veteran's benefits are held in an account making those funds "readily available as needed for support and maintenance," and the funds are not "converted into permanent investments" or into property, <u>Porter</u>, 370 U.S. at 162; <u>Lawrence</u>, 300 U.S. at 249, they retain their identity as "public money" under § 641. Furthermore, even if VA funds are commingled in an account with other funds, they will retain their VA character as long as they are readily traceable and may be accounted for with a standard accounting method, such as first-in, first-out tracing. <u>See</u> <u>S & S Diversified Servs., L.L.C. v. Taylor</u>, 897 F. Supp. 549, 552 (D. Wyo. 1995) (reasoning that "social security benefits deposited in a joint bank account retain their exempt status [pursuant to 42 U.S.C. § 407] if they are readily traceable"); <u>NCNB Fin. Servs., Inc. v. Shumate</u>, 829 F. Supp. 178, 180-81 (W.D. Va. 1993) ("If the recipient of social security benefits commingles the benefits with other funds, he is entitled to protection as to those funds that are reasonably traceable to social security income.").[13]

---

[13]Pursuant to 42 U.S.C. § 407(a), social security benefits are similar to veteran's benefits in that they are exempt from "execution, levy, attachment, garnishment, or other legal process, [and from] the operation of any bankruptcy or insolvency law."

### 3. The district court's calculation of restitution

The district court imposed $27,002 in restitution, based on Griffith's misappropriation of the following VA funds:

**$3,118** directly diverted from Norvell's funds-receiving account and used for Griffith's benefit;

**$9,495** in bills left unpaid after Griffith's unauthorized cash withdrawals from Norvell's funds-receiving account;

**$4,236** (60% of $7,060) in lump-sum VA payments dissipated by Griffith and used more for her benefit than for Norvell's; and

**$10,153** in VA funds "obligated" by Griffith's misuse of Norvell's credit.

As to the VA funds obligated by Griffith's misuse of Norvell's credit, the district court reasoned that because Griffith was responsible for loss to Norvell of $18,130, or 60% of $30,216, in accumulated credit card debt, see supra § II.A.4.i.b, and because VA benefits constituted roughly 56% of Norvell's total income during the period covered by the indictment, 56% of $18,130 had been "obligated toward the repayment of this debt." (PSR at 16.)

### 4. Analysis

As regards the $3,118 directly diverted from Norvell's account and the $9,495 in funds withdrawn to pay bills but which were not used to pay bills, the record contains ample evidence demonstrating that the Government met its burden of proving actual loss caused by the offense of conviction. As regards the $4,236 in lump-sum VA payments and the $10,153 in VA funds "obligated" by Griffith's

- 31 -

misuse of Norvell's credit, however, we conclude that the Government failed to meet that burden.

### i. Lump-sum payments

While we do not doubt that Griffith may be ordered to pay restitution for her dissipation and misappropriation of lump-sum benefit payments to Norvell, her offense of conviction is theft of U.S. funds during the period from March of 2003 to July of 2005. At Griffith's sentencing hearing, VA Agent Sewell first testified that during the period covered by the indictment, $7,543 in lump-sum benefit payments were deposited into Norvell's account.[14] On cross-examination, however, he corrected that figure, testifying, "as I'm looking at it now, one of those payments was made–one of the lump sum payments was made before [Griffith] was fiduciary." (R. vol. III at 70.) According to Agent Sewell, that payment, of $4,250, was made in August of 2002.

Because the Government did not put on evidence demonstrating that Griffith dissipated and misappropriated this payment of $4,250 during the period of the offense of conviction, the district court erred in ordering Griffith to pay restitution for the loss of 60% of that payment. Therefore, the restitution order must be reduced by $2,550, or 60% of $4,250.

---

[14]The Government cites Agent Sewell's testimony–before he corrected himself–in support of its claim that the district court accurately held Griffith accountable for restitution of 60% of lump-sum payments of $7,060. Nowhere did Sewell mention the figure $7,060, and nowhere did the PSR or district court explain the source of that figure.

### ii. VA funds "obligated" by credit card debt

Because the Government did not put on evidence that the accumulated credit card debt was ever paid and thus did not prove actual loss to Norvell from that debt, <u>see</u> <u>supra</u> § II.A.4.i.b, the district court erred in ordering Griffith to pay restitution for that debt. Furthermore, we note that because Griffith may be ordered to pay restitution only for conduct underlying the offense of conviction, she may be ordered to pay restitution only for Norvell's loss of VA benefits; and under 38 U.S.C. § 5301(a)(1), those benefits are "exempt from the claim of creditors," and "not . . . liable to attachment, levy, or seizure by or under any legal or equitable process whatever." Therefore, in the absence of evidence demonstrating that Norvell actually repaid the credit card debt with VA funds, the district court lacked authority to impose restitution upon Griffith for even a portion of that debt. Consequently, the restitution order must be reduced by an additional $10,153.

### 5. Conclusion as to restitution

Because the district court exceeded its authority and thus abused its discretion in ordering Griffith to pay restitution for conduct not proven to underlie the offense of conviction and conduct not proven to have caused actual loss, the restitution order must be reduced by a total of $12,703.

## III. CONCLUSION

We AFFIRM the district court's calculation of loss. We VACATE the restitution order and REMAND to the district court with instructions to impose restitution in the amount of $14,299.