**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 26, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

v.

JANICE LYNN RATLIFF,

  Defendant-Appellant.

No. 09-7037
(D.C. No. 6:08-CR-00035-JHP-1)
(E.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **PORFILIO**, and **O'BRIEN**, Circuit Judges.

---

Defendant Janice Lynn Ratliff appeals from the sentence imposed after she

pled guilty to a criminal information charging her with one count of bank fraud,

in violation of 18 U.S.C. § 1344.  We affirm.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.  Factual Background and Procedural History

### a.  The Charge against Ms. Ratliff

On May 27, 2008, a criminal complaint was filed against Ms. Ratliff, alleging that from September 2004 through April 2005, she "devised a scheme and artifice to defraud The Bank N.A., McAlester, Oklahoma, . . ., in order to obtain funds under the custody or control of said financial institution by means of false or fraudulent representations."  R., Vol. 1, at 8.  The complaint further alleged that she "obtained approximately 10 checks totaling approximately $116,430.84, made payable to Wynn's Electronics, a business owned by the defendant[']s employer, Jim Wynn, Inc., and deposited them in the fraudulently established bank account at The Bank N.A., in violation of" 18 U.S.C. § 1344.  R., Vol. 1, at 8.  The FBI agent making the complaint, Special Agent James A. Dawson, attached an affidavit stating that Ms. Ratliff "exercised complete control over the disbursement of the funds deposited in the aforementioned account at The Bank N.A."  *Id.* at 10.  He further averred that "an additional approximately $378,642.80 in checks . . . were determined to have been cashed by Janice Ratliff at Latimer State Bank and Wilburton State Bank, both of Wilburton, Oklahoma[, and t]he proceeds of these checks remained in the custody and control of Janice Ratliff."  *Id.*  He asserted that a total of "approximately $495,073.64 in checks made payable to Jim Wynn, Inc., was embezzled by Janice Ratliff" between January 2003 and April 2005.  *Id.*

On June 11, 2008, the U.S. Attorney filed an information charging Ms. Ratliff only with one count of bank fraud involving $116,430.84 at The Bank, N.A. in McAlester. *Id.* at 11-12. On June 13, 2008, Ms. Ratliff pled guilty to this charge. R., Vol. 2, at 8, 19. After two hearings, the district court sentenced her to sixty months' imprisonment, thirty-six months of supervised release, a special assessment of $100.00, and restitution of $484,023.62. *Id.*, Vol. 1, at 88-91, Vol. 2, at 188-90.

### b. The Sentencing Hearings

James P. Wynn, Ms. Ratliff's former employer, testified at the first sentencing hearing. *Id.*, Vol. 2, at 37. Mr. Wynn stated that he is an entrepreneur who for many years had owned a business in Wilburton, Oklahoma, that sold electronics to consumers and leased specialized communications and other equipment to the oil and gas industry. *Id.* at 37-38. His business was called "Jim Wynn, Inc.[,]" *id.* at 59, and he had "a Radio Shack dealership as well as a U.S. Cellular agency." *Id.* at 38. He said that his wife had worked with Ms. Ratliff at a manufacturing plant in Wilburton and thought she was "a good gal[,]" so she was hired to work for him. *See id.* He said that Ms. Ratliff was one of the "early" employees hired as his business grew, and she worked for him for about eighteen years. *Id.* at 39-40.

On direct examination, Mr. Wynn testified that Ms. Ratliff initially did sales in the retail store, but she later became the "office manager[,]" *id.* at 39, and was a "salaried employee[,]" earning "roughly 700 to 800 dollars a week, paid weekly[,]" *id.* at 56-57.  On cross-examination, he agreed that Ms. Ratliff worked for him as a "clerk in [his] Radio Shack business and [his] oil field business and other related businesses[.]"  *Id.* at 76.  He later repeated that "she was the office manager."  *Id.* at 81.  He described her duties:

> She . . . was responsible for receiving stock, checking that into the computer, she did the payroll, kept track of the payroll records, kept track of the incoming stock invoices, put those in the receivables – I mean, payables file for my wife.  She would do the daily reconciliation of the books, she dictated the – when I – in the absence of my wife and I, she was the one to take care of business, tell other employees what to do.

*Id.* at 39-40.  Mr. Wynn further testified that

> [a]s we earned her trust and as our business grew, we gave her additional duties to fulfill.  Naturally, as a business grows and expands, there's more to do, more to keep up with, and we gave her limited things to do.  She never did – my wife was still the bookkeeper as far as keeping the general ledger, paying the bills.  Ms. Ratliff was never on the signature card at any bank, never authorized to write any checks.

> In our absence, her duties were to receive payments, whether it be daily receipts from the retail operation or payments from the oil companies for the lease of equipment, and then in our absence, she would take those – receive those payments, show them received in the receivables file for my wife to then input into the billing computer, and then make deposits.

*Id.* at 40-41.

Mr. Wynn stated that beginning in approximately August 2003, his wife, Dinah Wynn, was "totally out of the business for several months" due to medical problems. *Id.* at 41. During the period of time that Mrs. Wynn was undergoing treatment, Mr. Wynn said that he was "out taking care of her as well and was out the majority of the time, then there fell more responsibilities to [Ms. Ratliff], but it was – she still never had anything to do with the payment of bills – . . . or anything to do with the checkbook." *Id.* at 42. Mr. Wynn said that he "trusted her like a sister. . . . trusted her through and through to the extent that [he and his wife] didn't give her full control." *Id.* at 43. When asked if, due to his absence from work, he was not able to supervise the business as well as he wanted to, he answered: "Correct." *Id.* at 81. And when asked if he "left it with [his] employees to do the right thing[,]" he answered: "I left it with Ms. Ratliff, yes." *Id.* He further stated that "[i]t was Mrs. Ratliff's duty to deposit the checks correctly and by law when [my wife and I] had – when [my wife and I] were unable to. If Ms. Ratliff delegated this duty, which was not correct, to [another employee], that was beyond me." *Id.* at 78. He said that "[t]here was a stamp, 'Jim Wynn, Incorporated.' The policy was for her to stamp the checks and then make a deposit." *Id.* at 89-90. Mr. Wynn had directed his employees to use the stamp. *Id.* at 90.

On April 5, 2005, Mr. Wynn got a call from a vice president at Latimer State Bank, who said: "'Janice is down here wanting to cash a $3,777 check.

What should I do?'" *Id.* at 43; *see also id.* at 75-76. Although Mr. Wynn said he did not know why Ms. Ratliff was "wanting to do that[,]" *id.* at 43, he agreed to let her cash that check and "follow up on it" later because he "trusted her[,]" *id.* at 44. He said he sometimes had employees cash checks for him and bring him the cash, but he "assume[d] that the bank and that employee were going to do it correctly and bring [him] the cash from a deposit." *Id.* at 77. He did not confront Ms. Ratliff at that time because he did not want to do so unjustly. *Id.* at 44. But he later determined that Ms. Ratliff's "scheme was . . . to stamp X number of checks – she may take eleven checks, stamp them with the stamp, take the twelfth check and take it and present it with a handwritten endorsement and say, I want to deposit these eleven, Ms. Cashier or Ms. Teller, but here, give me cash for this one." *Id.* at 90.

Mr. Wynn then "research[ed] back to January 1 of '03[,]" *id.* at 67, and determined that "approximately [$]484,000 or [$]495,000 . . . was the loss experienced by the Wilburton bank, the Bank N.A., and Latimer State Bank" based on "actual physical evidence that [he and his wife] could produce." *Id.* at 50-51. He broke down the amounts allegedly converted by Ms. Ratliff through improperly handled checks as follows: "$252,620.55 through the Wilburton State Bank[,]" *id.* at 66, "$115,327.56, through Latimer State Bank," *id.* at 66-67, and "$116,075.51 to the Bank, N.A.," *id.* at 67. The total of those three losses was $484,023.62. *Id.*

Mr. Wynn testified that Ms. Ratliff had set up a bank account "in the name of 'Janice Ratliff, doing business as Wynns Electronics[,]'" but she actually had no rights or permission from him to do business under that name. *Id.* at 98, 101. He stated that she falsified a bill of sale, forging Mrs. Wynn's signature to it, and falsified other documents to present to The Bank, N.A., in order to "open[] a bank account in that name to further her scheme." *Id.* at 98-99. She then deposited checks for his company into her new account. *Id.* at 99.

Mr. Wynn testified that it had been very time-consuming to determine the loss, *id.* at 50, 65-66, 71, 88-90, and that three experts had told him that the fraud "was difficult to catch because of the way it was done[,]" *id.* at 102; *see also id.* at 71, 88-89. When asked if over $400,000 had been stolen from him and he did not catch it for over a year, he answered: "True, true." *Id.* at 88. He explained that even if he "had had an accountant or a bookkeeper, three of them have stated that they probably would not have caught this embezzlement." *Id.* at 89. When asked why he had had difficulty determining that there was money missing from his business, Mr. Wynn also testified that he and his wife "were not in [their] normal means of business because of [his] wife's illness and [his] time out of the business." *Id.* at 103.

The government called no witnesses other than Mr. Wynn at the first hearing. *See id.* at 103. Both sides offered certain documents into evidence during the initial sentencing hearing, and the district court continued the hearing.

At the second sentencing hearing, the government offered the testimony of Special Agent Dawson, who had investigated the fraud case against Ms. Ratliff. *Id.* at 128. His investigation involved reviewing the records, checks, and documents, and interviewing witnesses associated with this case at The Bank, N.A., in McAlester, and Wilburton State Bank and Latimer State Bank in Wilburton. *Id.* at 128-29.

Agent Dawson explained that Ms. Ratliff had used fraudulent documents to establish an account at The Bank, N.A., had deposited checks made payable to Jim Wynn, Inc. or an entity owned by Jim Wynn into that account, and then had used the money for her own purposes. *See id.* at 129-30. He said she used approximately ten checks to procure approximately $116,000 at The Bank, N.A. *Id.* at 147. He said that at Wilburton State Bank, Ms. Ratliff had received cash or cashier's checks after presenting checks, made payable to Jim Wynn, Inc. or an entity owned by Jim Wynn, which were endorsed on the back with her signature and/or the forged signature of Jim Wynn. *Id.* at 130-32. Agent Dawson determined from talking to Mr. Wynn that she did not have permission to use his name to cash checks, *id.* at 149, and testified that "there is no reason . . . any reasonable person would ever suspect or believe that that cash was ever in the hands of Mr. Wynn[,]" *id.* at 150. The government presented several exhibits of cashier's checks made payable to accounts belonging to Ms. Ratliff, *see id.* at 135-44, 158, and Agent Dawson testified that "the funds ultimately came from

-8-

Jim Wynn, Incorporated[,]" *id.* at 143. He said that at Latimer State Bank, Ms. Ratliff had cashed checks made payable to Jim Wynn, Inc. or another entity owned by Jim Wynn, using endorsements of her signature and/or the forged signature of Jim Wynn, and had used the money for her own purposes. *Id.* at 144-145. Agent Dawson determined from talking to Jim Wynn that Mr. Wynn did not receive these funds, either. *Id.* at 152. Agent Dawson testified that all of the checks mishandled at all three banks were cashed in a common scheme or plan over a common period of time, from 2003 into 2005. *Id.* at 145. He said that the loss to Wilburton State Bank was $252,620.55, the loss to Latimer State Bank was $115,327.56, and the loss to The Bank, N.A., was $116,075.51, making a total loss of "approximately $484,000.00[,]" *id.* at 159-60—and specifically $484,023.62.

### c. The Sentencing Factors

As noted above, ultimately, Ms. Ratliff was not charged with embezzlement from Jim Wynn, Inc., but was charged only with one count of bank fraud based on the phony account she opened at The Bank, N.A. *See id.* at 17, 25. She stated at her change-of-plea hearing that, in August 2004, she "opened a bank account under Wynn's Electronics that had [her] name and [her] social security number at McAlester, Oklahoma, The Bank N.A." *Id.* at 25. She admitted that her purpose in opening the bank account was to defraud her employer of money by depositing

his checks in that checking account. *See id.* She also admitted that she intended to execute a scheme that defrauded the bank, and intended to obtain money by false or fraudulent pretenses. *See id.* at 26. She also agreed that the government's evidence would show that she

> represented to the bank that the interest in a particular business that the Wynns[] owned was being sold to [her], at which point in time there was a document prepared at which she forged the signature of Mrs. Wynn in order to establish that relationship, which in turn not only defrauds the Wynns, but it defrauds the bank because it's a . . . misrepresentation to the bank.

*Id.* at 26-27. She admitted that she executed that document with the intent to defraud. *See id.* at 27.

At the end of the second sentencing hearing, the district court pronounced Ms. Ratliff's sentence. Overruling Ms. Ratliff's objection, the court found by a preponderance of the evidence "that there was a common scheme or plan regarding the funds obtained from the checks fraudulently presented and/or converted at Wilburton State Bank and Latimer State Bank and . . . the funds associated with those checks [were] appropriately considered as relevant conduct." *Id.* at 180. Counsel for Ms. Ratliff argued that when she cashed checks at Wilburton State Bank and Latimer State Bank—which amounted to nearly $300,000—she gave the cash to Mr. Wynn. *See id.* at 173-74. The court rejected her argument, and added fourteen points to the base offense level for the amount of loss. *Id.* at 180.

Further, overruling Ms. Ratliff's objection, the court also added two points for abuse of a position of trust under U.S.S.G. § 3B1.3, finding that Ms. Ratliff "was a trusted employee, given very little oversight." *Id.* at 181. The court noted that Mr. Wynn "described her position as office manager and added that while he and his wife were not present at the business, Ms. Ratliff had control of the same." *Id.* at 181-82. The court also noted that another employee, Rachel Sennet, stated at a deposition prepared for another case that Ms. Ratliff acted as supervisor for her and other employees when the Wynns were not present. *Id.* at 182. The court found by a preponderance of the evidence that Ms. Ratliff's "position facilitated her ability to carry out and conceal this scheme." *Id.*

Again, overruling Ms. Ratliff's objection, the court also added two points for the use of sophisticated means under U.S.S.G. § 2b1.1(b)(9). *Id.* at 182-83. The court found that she "went to extraordinary lengths to carry out this offense[,] . . . creating a false bill of sale and establishing – and establishment of a bank account and under false pretenses." *Id.* at 183. The court also mentioned the government's "documentation of various exhibits[,]" although the court did not describe them. *See id.*

The court found that the total offense level was 25 and the criminal category was I, resulting in an advisory sentencing range of 57 to 71 months. *Id.* at 188. The court adopted the presentence report as the factual basis for the sentence, except where corrected by the court's findings. *Id.* As noted above, the

court sentenced Ms. Ratliff to sixty months' imprisonment, thirty-six months of supervised release, a special assessment of $100.00, and restitution of $484,023.62. *Id.* at 188-90. Ms. Ratliff appeals.

## II. Issues on Appeal

Ms. Ratliff argues that the district court: (1) employed an incorrect definition of a "position of trust" and lacked a sufficient factual basis to support the application of the enhancement for abuse of a position of trust under U.S.S.G. § 3B1.3, because she was not an agent or employee of the victim of the bank fraud, The Bank, N.A., and lacked the requisite managerial discretion in her position with Jim Wynn, Inc.; (2) lacked a sufficient factual basis to support a two-point enhancement for use of sophisticated means under U.S.S.G. § 2B1.1(b)(9)(C) because her bank fraud scheme was not especially complex or intricate, as required by the commentary accompanying the Guideline; (3) improperly failed to find relevant conduct of embezzlement beyond a reasonable doubt instead of under the usual preponderance of the evidence standard when the court determined that the amount of loss and restitution was higher than the amount she had admitted, $116,430.84; (4) improperly determined the amount of loss and restitution because, under any evidentiary standard, it was error to include alleged criminal acts of embezzlement as relevant conduct to the

offense of bank fraud; and (5) improperly failed to subtract three points for acceptance of responsibility.

### III.  Discussion

#### a.  Position of Trust Enhancement under U.S.S.G. § 3B1.3

The district court imposed a two-point enhancement pursuant to U.S.S.G. § 3B1.3 for abuse of a position of trust.[1]  "Whether a defendant occupied a position of trust under USSG § 3B1.3 is generally a factual matter that we review for clear error."  *United States v. Spear*, 491 F.3d 1150, 1153 (10th Cir. 2007) (quotation omitted).  Ms. Ratliff argues that the district court used the wrong definition for a position of trust, however, which is a legal question that we review de novo.  *Id.*  She also argues that the position of trust enhancement does not apply because the position of trust must be in relation to the victim of the charged offense, which was The Bank, N.A., not Jim Wynn, Inc. We review this legal question de novo.  *See id.*  She further asserts that the district court lacked a sufficient factual basis as a matter of law to support the application of the enhancement for abuse of a position of trust, which we also review de novo.  *United States v. Hamilton*, 587 F.3d 1199, 1222 (10th Cir. 2009).  We reject Ms. Ratliff's arguments.

---

[1]     U.S.S.G. § 3B1.3 provides, in pertinent part:  "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase [the offense level] by 2 levels."

"To invoke § 3B1.3, the defendant must either occupy a formal *position* of trust or must create sufficient indicia that [s]he occupies such a position of trust that [s]he should be held accountable as if [s]he did occupy such a position." *United States v. Haber*, 251 F.3d 881, 891 (10th Cir. 2001) (quotation omitted).

> In the fraud context, we have applied § 3B1.3 in two types of cases. The first is where the defendant steals from his employer, using his position in the company to facilitate the offense. *See, e.g.*, *United States v. Levy*, 992 F.2d 1081 (10th Cir. 1993) (official of bankrupt company embezzled from company, defrauding trustee and company's creditors); *United States v. Chimal*, 976 F.2d 608 (10th Cir. 1992) (embezzlement by company comptroller). The second is where a "fiduciary or personal trust relationship exists" with other entities, and the defendant takes advantage of the relationship to perpetrate or conceal the offense. *United States v. Brunson*, 54 F.3d 673, 677 (10th Cir.), *cert. denied*, 516 U.S. 951 (1995).

*United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996).

"Before imposing this enhancement, a district court must find two things: (1) the defendant possessed a position of trust; and (2) the defendant abused the position to significantly facilitate the commission or concealment of the offense." *United States v. Guidry*, 199 F.3d 1150, 1159 (10th Cir. 1999) (citing *United States v. Burt*, 134 F.3d 997, 998-99 (10th Cir. 1998)). "However, to reach the second prong of *Burt* a district court must first find the defendant occupied a position of trust, and our case law clearly states the position of trust must be found in relation to the victim of the offense: The question of whether an

individual occupied a position of trust is evaluated from the victim's perspective." *Id.* at 1160 (quotation omitted).

The question of how narrowly or broadly the term "victim" should be defined is in dispute among the circuits. *United States v. Edwards*, 325 F.3d 1184, 1188 n.1 (10th Cir. 2003) (noting circuit split is discussed in *Guidry*, 199 F.3d at 1160 n.6). We affirm the district court's conclusion that Mr. Wynn was a victim of Ms. Ratliff's bank fraud, *see* R., Vol. 2, at 181, because his company, Jim Wynn, Inc., was the true owner of the checks she converted to her own use through that fraud. She relies upon *Guidry*, but that case is clearly distinguishable because the crime in that case was filing false income tax returns, and the government was necessarily the only victim of that crime. *See* 199 F.3d at 1160. We move on to Ms. Ratliff's other arguments.

Ms. Ratliff asserts error on the first step of *Burt*, arguing that the imposition of the position of trust enhancement was legal error because she did not occupy a position of trust vis-a-vis either The Bank, N.A. or Jim Wynn, Inc., under the correct definition of the term as applied to the facts elicited at sentencing. The district court made no explicit finding that Ms. Ratliff occupied a position of trust with regard to either The Bank, N.A. or Jim Wynn, Inc., but the court's decision may be read to imply that the court viewed Ms. Ratliff to occupy a formal position of trust with respect to Jim Wynn, Inc. *See* R., Vol. 2, at 181-82.

In defining a position of public or private trust, the Guidelines' Application Note 1 to § 3B1.3 provides that:

> "Public or private trust" refers to a *position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).* Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.

*Spear*, 491 F.3d at 1153-54 (quoting U.S.S.G. § 3B1.3, cmt. n.1) (emphasis in original). "The commentary goes on to illustrate the scope of the enhancement—it applies, for example, to professionals like lawyers or doctors, but not to bank tellers or hotel clerks." *Spear*, 491 F.3d at 1154.

We have previously explained that "the term 'position of trust' is a bit of a misnomer" because this enhancement "has little to do with *trustworthiness* and everything to do with *authority* and *discretion*." *Spear*, 491 F.3d at 1154 (discussing *Edwards*, 325 F.3d at 1188) (emphasis in original). A position of trust is "a position of authority characterized by the exercise of professional or managerial discretion[.]" *Id.* We have held that "discretion" means, in general, that an employee was charged "with deciding, on a case-by-case basis, whether a particular expenditure or transfer of company funds or other valuables is necessary or beneficial to the organization." *Edwards*, 325 F.3d at 1188. Where a defendant, in her position as a buyer, was "authorized to purchase goods and services for [her employer] costing up to $100,000 without supervisory

-16-

approval[,]" we concluded that the district court correctly found that she was in a position of trust. *See United States v. Arreola*, 548 F.3d 1340, 1346-47 (10th Cir. 2008). More generally, managerial discretion is shown by "authority to engage in case-by-case decision-making, to set policies, and to grant exceptions to governing policies or protocols." *Spear*, 491 F.3d at 1155. However, "[t]hese factors are non-exhaustive, and no one factor is dispositive of the analysis." *Id.*

"'The fact that [the defendant] was *trusted* by her employer with significant *responsibility* . . . is not determinative.'" *Id.* at 1154 (quoting *Edwards*, 325 F.3d at 1187 (alteration in original; emphasis added)). And "'job titles themselves do not control; actual duties and authorized activities do.'" *Id.* at 1157 (quoting *Edwards*, 325 F.3d at 1187). The fact that a defendant was given little supervision does not necessarily mean that her duties were not ultimately ministerial. *See id.* at 1155. "The commentary for § 3B1.3 contemplates a continuum of discretion from bank teller to professional[, and s]omewhere along the continuum an employee moves from ministerial to discretionary in the performance of job duties." *Spear*, 491 F.3d at 1157. To reach a conclusion, the court "must undertake a functional analysis of job responsibilities" to determine whether those duties were actually managerial rather than merely ministerial. *Id.* at 1155.

We have emphasized "that the lack of 'any [ ] authority to make substantial discretionary judgments' is key in determining whether the enhancement applies."

-17-

*Id.* at 1154 (quoting *Edwards*, 325 F.3d at 1187 (holding that employee in accounting department was not in position of trust)). And the fact that "company officials trusted [her], and that her position gave her access to customers' checks and important company records" is not enough if the evidence does not support the conclusion that she had authority to make substantial discretionary judgments. *See Edwards*, 325 F.3d at 1187. This is so because "[o]pportunity and access do not equate to authority, or to the kind of 'substantial discretionary judgment that is ordinarily given considerable deference.'" *Id.* (quoting U.S.S.G. § 3B1.3, cmt. n.1). If "the facts show no more than that [defendant's] job was responsible but ministerial[,]" they will not meet the "higher level" bar set by Application Note 1. *See id.* at 1188. The district court relied on the fact that Mr. Wynn said her title was "office manager[,]" *id.* at 181, and a former coworker said she was a "supervisor[,]" *id.* at 182. The court also relied on the fact that Ms. Ratliff was "a trusted employee, given very little oversight[,]" *id.* at 181, and said that when the Wynns were not present, she had "control" of the business, *id.* at 181-82.

Additionally, Mr. Wynn's testimony indicated he believed Ms. Ratliff's duties entailed a managerial level of discretion. This belief is manifest in the fact he left her in charge of the operation of the business during his long absences. Also, when Mr. Wynn was notified by a vice president of the Latimer State Bank that Ms. Ratliff wanted cash for a check payable to Jim Wynn Incorporated, he

authorized the transaction. He did so and did not challenge her even though he could not understand why Ms. Ratliff wanted to make the transaction.

A more precise questioning of Mr. Wynn could have produced more specific answers from Mr. Wynn about the full nature of Ms. Ratliff's employment, but we do not believe that to be consequential. When all the evidence on point is taken together, as it must be, we believe it is sufficient to establish Ms. Ratliff held a position of trust as governed by U.S.S.G. § 3B1.3.

### b. Sophisticated Means Enhancement under U.S.S.G. § 2B1.1(b)(9)(C)

The district court added two points for the use of sophisticated means under U.S.S.G. § 2B1.1(b)(9)(C). "When reviewing a district court's application of the Sentencing Guidelines, we review legal questions *de novo* and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Jones*, 530 F.3d 1292, 1305 (10th Cir.) (quotation omitted), *cert. denied*, 129 S. Ct. 583 (2008). As in *Jones*, "[h]ere, Ms. [Ratliff has] not contested findings of fact or the district court's interpretation of the Guidelines; [she] contest[s] only the district court's application of the Guidelines to the facts." *Id.* Accordingly, "we will review the district court's decision deferentially rather than *de novo*." *Id.* We reject Ms. Ratliff's argument that her challenge to the court's application of the

sophisticated means enhancement on the facts of this case presents a question of law that we should review de novo.

Section 2B1.1(b)(9) provides that a sentencing court must assess a two-level increase in the offense level of a defendant

> [i]f (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of the fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means . . . .

*Jones*, 530 F.3d at 1305 (quoting U.S.S.G. § 2B1.1(b)(9)) (alteration in original). We have noted that "[t]he accompanying commentary explains that 'sophisticated means' refers to an '*especially* complex or *especially* intricate offense conduct pertaining to the execution or concealment of an offense.'" *Id.* (citing U.S.S.G. § 2B1.1(b)(9) cmt. n.8(B)) (emphasis added). And we have also noted that the commentary "that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading, of that guideline." *Id.* (quotation omitted).

The district court based the sophisticated means enhancement under § 2B1.1(b)(9)(C) on the admitted facts that Ms. Ratliff forged a bill of sale showing that she owned Wynn's Electronics and then established an account in her name at The Bank, N.A. under those false pretenses. *See* R., Vol. 2, at 183. Ms. Ratliff argues that opening a phony bank account is not especially complex or intricate and does not satisfy the meaning of the Guideline applied in this case.

We acknowledged in *Jones* that the commentary to the Guideline requires that a "sophisticated" scheme be "especially" complex or "especially" intricate. 530 F.3d at 1305-06. Nevertheless, we upheld the application of the sophisticated means enhancement under the facts of that case. *See id.* Ms. Ratliff argues that this case falls instead within the facts of *United States v. Rice*, 52 F.3d 843, 849-50 (10th Cir. 1995), which involved a different sophisticated means Guideline, and where we did not uphold the application of that enhancement.

We believe that the facts of this case fall between those in *Rice* and *Jones*. *Rice* was a tax case where the defendant "merely claimed to have paid withholding taxes he did not pay." 52 F.3d at 849. In this case, by way of contrast, Ms. Ratliff told lies to The Bank, N.A. and, to sell her lies, forged both a bill of sale and also a second document purporting to show Mrs. Wynn conveying a particular company check to Ms. Ratliff.

*Jones* is also distinguishable on the facts—in addition to creating fraudulent checks on their home computers, those defendants also recruited a "sizeable group" of accomplices to provide them with confidential, non-public bank account information. 530 F.3d at 1305-06. In this case, however, although there was evidence that other employees also mishandled a few checks, there was no evidence that Ms. Ratliff enlisted any accomplices in her scheme.

The government asserts that Ms. Ratliff manipulated the company's financial records to conceal her fraud. Aplee. Br. at 38. The evidence cited,

however, indicates only that Ms. Ratliff exploited a vulnerability in the audit process—Mr. Wynn testified that a normal audit does not correlate deposits to income and that experts told him that a normal audit would not have caught Ms. Ratliff's fraud. R., Vol. 2, at 88-89. Nevertheless, Mr. Wynn testified that Ms. Ratliff recorded the mishandled checks "paid written in hand, . . . but it was never, quote, rung up or run through the point-of-sale computer that would have showed [sic] it for the sales that day." *Id.* at 50. This evidence shows that failing to enter some checks into the computer was part of Ms. Ratliff's overall scheme to deposit most checks correctly by stamping them for deposit with the company's stamp, but to then misdirect/mishandle one check out of a stack by handwriting an endorsement and presenting it for cash at one of the company's banks in Wilburton or depositing it into her phony company account at The Bank, N.A. in McAlester, making the fraud difficult to detect. *See id.* at 89-90.

The sophisticated means enhancement applies if the overall scheme was sophisticated, even if the individual acts were not. *Jones*, 530 F.3d at 1306. In *Jones*, we noted in particular the Fifth Circuit's decision in *United States v. Wright*, 496 F.3d 371, 377-79 (5th Cir. 2007). We called the scheme in *Wright* "less complex than the one at issue." *Jones*, 530 F.3d at 1306. We pointed out that in *Wright*, "the defendant, a mortgage broker, misrepresented the net worth of some of his clients to potential lenders. He did so by purchasing cashier's checks in the names of his clients and forwarding copies of the checks to the lenders,

-22-

thereby giving the impression that the checks were the borrowers' assets." *Jones*, 530 F.3d at 1306. Those facts strike us as very similar to Ms. Ratliff's scheme. Giving due deference to the district court's decision, we conclude that the court did not err in applying the sophisticated means enhancement to Ms. Ratliff.

### c. Relevant Conduct—Legal Standard

The district court determined that the government proved by a preponderance of the evidence that Ms. Ratliff was accountable for losses at all three banks where Wynn Electronics' checks were mishandled and ordered her to make restitution in the amount of $484,023.62. R., Vol. 2, at 184, 189. However, the amount she admitted she fraudulently converted to her own use through her phony account at The Bank, N.A. in McAlester was only $116,430.84. *See* R., Vol. 1, at 11-12; *id.*, Vol. 2, at 19.

Ms. Ratliff argues that the district court should not have included losses due to embezzlement separate from the bank fraud as relevant conduct unless those losses were proved beyond a reasonable doubt. She maintains that because she was unwilling to plead guilty to embezzlement, and the government did not include the count charging embezzlement in the information, the court unfairly increased her sentence by including losses due to embezzlement based on proof by a preponderance of the evidence.

"We review *de novo* any legal questions underlying the district court's application of the Guidelines." *United States v. Griffith*, 584 F.3d 1004, 1011 (10th Cir. 2009). Ms. Ratliff acknowledges that we have held that "[b]oth before and under the Guidelines, facts relevant to sentencing have generally been found by a preponderance of the evidence." *United States v. Magallanez*, 408 F.3d 672, 684 (2005) (citing *United States v. Watts*, 519 U.S. 148, 156 (1997)). Indeed, the Supreme Court has held that "[a] jury verdict of *acquittal* on related conduct . . . 'does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.'" *Id.* (quoting *Watts*, 519 U.S. at 157) (emphasis added). Nevertheless, Ms. Ratliff asks us to reconsider our holding in *Magallanez* based on the reasoning of some of the other circuits that a higher standard of proof may be necessary to satisfy due process where "a sentence enhancement factor becomes the 'tail which wags the dog of the substantive offense.'" Aplt. Opening Br. at 53 (quoting *United States v. Townley*, 929 F.2d 365, 369 (8th Cir. 1991) (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986))).

There are two problems with Ms. Ratliff's argument. First, in *McMillan*, the Supreme Court rejected the argument that "if a State wants to *punish* visible possession of a firearm [in a defendant's sentence] it must undertake the burden of proving that fact beyond a reasonable doubt." *See* 477 U.S. at 84 (emphasis added). The Court also rejected an argument that due process requires that a fact

-24-

treated "as a sentencing consideration rather than an element of a particular offense" must "be proved by at least clear and convincing evidence" rather than by a preponderance of the evidence. *Id.* at 91. The Court pointed out that "[s]entencing courts have traditionally heard evidence and found facts without any prescribed burden of proof at all." *Id.* Second, we are foreclosed by our own prior holding in *Magallanez* that sentencing factors are generally proved by a preponderance of the evidence. 408 F.3d at 684. "[W]e are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *United States v. Albert*, 579 F.3d 1188, 1197 n.11 (10th Cir. 2009) (quotation omitted). The district court correctly found relevant conduct by a preponderance of the evidence.

### d. Relevant Conduct—Determination of Losses to Include in Restitution

Ms. Ratliff argues in the alternative that the district court erred in setting the amount of restitution at $484,023.62 because, under any evidentiary standard, it was error to include alleged criminal acts of embezzlement as relevant conduct to the admitted offense of bank fraud. We disagree.

"While we review for clear error the district court's factual findings in support of a determination of relevant conduct, we review the ultimate determination of relevant conduct de novo." *Griffith*, 584 F.3d at 1012-13 (quotation omitted). "Relevant conduct under the Guidelines . . . comprises more,

often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct." *Id.* at 1012 (quotations omitted). We have held "that for a district court to consider a defendant's conduct as 'relevant' under the Sentencing Guidelines, the Government must prove by a preponderance of the evidence that the defendant (1) engaged in conduct (2) related to the offense of conviction pursuant to U.S.S.G. § 1B1.3 and (3) constituting a criminal offense under either a federal or a state statute." *Griffith*, 584 F.3d at 1013.

"The Sentencing Guidelines provide that the court should take into account all activities that form part of the 'same course of conduct or common scheme or plan as the offense of conviction,' U.S.S.G. § 1B1.3(a)(2), even if the defendant was never charged with that additional conduct and the jury never found h[er] guilty of it." *United States v. Caldwell*, 585 F.3d 1347, 1350 (10th Cir. 2009). "The Guidelines commentary . . . explains that

> For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi. . . .
>
> . . . . Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.

*Griffith*, 584 F.3d at 1012 (quoting U.S.S.G. § 1B1.3 cmt. n.9(B)). "We have interpreted this language to mean that if the conduct is sufficiently similar and

-26-

within the same temporal proximity, it may be considered relevant for purposes of determining the guideline range." *Id.* (quotations omitted).

We have thoroughly reviewed the evidence. Special Agent Dawson testified that all of the checks Ms. Ratliff mishandled at all three banks were cashed in a common scheme or plan over a common period of time, from 2003 into 2005. R., Vol. 2, at 145. We conclude that the district court properly rejected Ms. Ratliff's argument that she cashed nearly $300,000 in checks and took the money back to Mr. Wynn (despite his testimony that she did not), and affirm the court's inclusion of all of the mishandled checks attributable to Ms. Ratliff as relevant conduct.

### e. Acceptance of Responsibility

Ms. Ratliff argues that the district court erred by failing to subtract three points for acceptance of responsibility because she accepted responsibility for the bank fraud that was the sole charge of the information. We reject this argument.

"The district court's acceptance of responsibility determination is subject to the clearly erroneous standard of review." *United States v. Quarrell*, 310 F.3d 664, 682 (10th Cir. 2002). "Because the 'sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility,' his or her decision is 'entitled to great deference on review.'" *Id.* (quoting U.S.S.G. § 3E1.1, cmt. n.5 (2001)). "The burden of proving acceptance of responsibility is on the defendant,

who must establish by a preponderance of the evidence a recognition and affirmative acceptance of personal responsibility for h[er] criminal conduct." *Id.* (quotation omitted). "Among the considerations used in determining whether a defendant should receive the acceptance of responsibility adjustment are whether the defendant admitted to the elements of the crimes *and whether the defendant admitted to, or at least did not falsely deny, any other relevant conduct*." *Id.* (citing § 3E1.1, cmt. n.1(a)) (emphasis added). "If a defendant denies relevant conduct and the court determines such conduct occurred, the defendant cannot claim to have accepted responsibility for h[er] actions." *United States v. Brown*, 47 F.3d 198, 204 (10th Cir. 1995).

The district court found "by a preponderance of the evidence that the Defendant's actions are inconsistent with an affirmative acceptance of responsibility. Not only does the Defendant maintain that she only committed fraud based on ten checks [taken to The Bank, N.A. in McAlester], she now implies that her employer was somehow involved in her fraudulent activities. Since the Defendant has falsely denied or frivolously contested relevant conduct found by this court, she should not receive points for acceptance of responsibility." R., Vol. 2, at 186. We have concluded that the court did not err in determining the extent of relevant conduct, and we also agree with the court's finding that Ms. Ratliff refused to accept the responsibility for the full extent of

her criminal conduct.  We conclude that the court properly determined that Ms. Ratliff was not entitled to a reduction for acceptance of responsibility.

## IV.  Conclusion

The judgment of the district court is AFFIRMED.

ENTERED FOR THE COURT
PER CURIAM

*United States v. Ratliff*

**PORFILIO**, J., dissenting.

I respectfully dissent.

Although I agree with most of the court's analysis of the issues of this case, I have reservations about the sufficiency of the evidence to support the district court's conclusion Ms. Ratliff held a "position of trust." I believe, as the majority notes, our caselaw requires that a person in a position of trust within a commercial setting be more than trustworthy. Here, to have a position of trust, Ms. Ratliff had to have been in a managerial rather than a ministerial position. Although Mr. Wynn testified Ms. Ratliff was "trusted" and needed "very little oversight," the actual substance of her duties is unclear. Indeed, I believe Mr. Wynn's testimony on that subject was internally conflicting.

The prosecutor framed his questions to Mr. Wynn in terms of the trust and responsibility he gave Ms. Ratliff, and Mr. Wynn answered in kind. As a result, the evidence elicited during the sentencing hearings failed to show the details of the discretion and authority Ms. Ratliff had in her position with Jim Wynn, Inc. What did she do on a regular basis to distinguish her as the leader of other employees, either when the Wynns were present to supervise her, or when they were not? Consequently, as distasteful as it may seem, I believe this case should be remanded for a fuller exploration of what Ms. Ratliff actually did that would show she had managerial authority.